TEXAS BOLL WEEVIL ERADICATION FOUNDATION, INC., Appellant,

v.

Eddie LEWELLEN, Jack F. Witten, Elliott Hayes, Scott Allison, Chris Lewellen, Randy Falkenberg, Ricky Biggs, Charles Burrus, Kevin Igo, and Mark K. Gunter, Appellees.

TEXAS BOLL WEEVIL ERADICATION FOUNDATION, INC., Appellant,

v.

Jack ABBOTT d/b/a Arroyo Farms, et al., Appellees.

Nos. 96–0745, 96–0839.

Supreme Court of Texas.

Argued Nov. 20, 1996.

Decided April 30, 1997.

Opinion Denying Rehearing Oct. 9, 1997.

Ed Small, Matt Dow, Ana Kirk Thornton, Austin, for Appellant.

Rudd F. Owen, Paul Lyle, Anna Evans, Plainview, Shannon H. Ratliff, William H. Bingham, Marc O. Knisely, Patricia D. Pope, Austin, for Appellees in No. 96–0745.

Randolph K. Whittington, Harlingen, Neil E. Norquest, Chris A. Brisack, McAllen, Rudd F. Owen, Plainview, Shannon H. Ratliff, William H. Bingham, Marc O. Knisely, Particia D. Pope, Deborah A. Vervil, Austin, for Appellees in No. 96–0839.

PHILLIPS, Chief Justice, delivered the opinion of the Court as to Parts I, II, IV, and V, in which OWEN, Justice, joins. GONZALEZ and BAKER, Justices, join in Parts I, IV, and V of the Court's opinion and in the judgment. HECHT, Justice, joins in Parts IV and V of the Court's opinion and in the judgment. CORNYN, ENOCH, SPECTOR and ABBOTT, Justices, join in Parts I, II, and IV of the Court's opinion.

Subchapter 74D of the Texas Agriculture Code (the Act) provides for the creation and

operation of an "Official Cotton Growers' Boll Weevil Eradication Foundation." Subject to referendum approval from the affected cotton growers, this Foundation is authorized to operate boll weevil eradication programs and assess the growers for the cost. Appellees in these consolidated direct appeals, who are cotton growers subject to the Foundation's jurisdiction, filed declaratory judgment actions challenging the Foundation's assessments on a variety of constitutional and statutory grounds. The trial court in each case invalidated the assessments and enjoined their collection.

We hold that the assessments levied by the Foundation constitute regulatory fees, rather than taxes, and thus are not taxes on an agricultural pursuit in violation of Article VIII, Section 1(c) of the Texas Constitution. We further hold that the Act, on its face and as applied to appellees, does not violate the right to equal protection under the United States or Texas Constitutions.

We do conclude, however, that the Legislature made an unconstitutionally broad delegation of authority to the Foundation, a private entity, thereby violating Article II, Section 1 of the Texas Constitution. For this reason, without reaching all the other constitutional and statutory arguments raised by appellees, we affirm the judgments of the trial courts.

## I

### A

There is no dispute among the parties to these appeals or the numerous amici curiae that the Anthonomus grandis Boheman, an insect commonly known as the boll weevil, presents a major economic threat to the Texas cotton industry. See TEX. AGRIC. CODE § 74.001. This pest, which entered Texas from Mexico in 1892, causes an estimated $20 million in crop loss in Texas every year. See HOUSE RESEARCH ORGANIZATION BILL ANALYSIS OF SB 30 at 5 (Feb. 24, 1993). To aid in the ongoing battle against the boll weevil, the Legislature in 1993 authorized the creation of the Official Cotton Growers' Boll Weevil Eradication Foundation. See TEX. AGRIC. CODE §§ 74.101–74.127.[1] Instead of directly creating the Foundation, however, the Legislature merely authorized the Commissioner of Agriculture to certify some nonprofit organization representing cotton growers to create the Foundation and propose geographic eradication zones. See TEX. AGRIC. CODE § 74.103(a). The Act authorizes the creating organization or the Foundation to conduct referenda in each proposed eradication zone ("zone referenda") to determine whether those cotton growers desire to establish an official boll weevil eradication zone. See id. § 74.105. Contemporaneous with the zone referendum, the growers are also to elect a member to represent them on the Foundation's board. See id. § 74.106. If the growers vote not to establish a zone, their board selection is without effect. Id. § 74.105(d).

Under the Act, once the initial zone has been created and the first board member elected, the growers of that zone must approve the assessment to fund the eradication at a subsequent referendum. Thereafter, the board is authorized to determine the assessment needed for each additional participating zone, which must be approved by the growers at a referendum. See id. § 74.113; 4 TEX. ADMIN. CODE § 3.3(c). The Foundation may collect the assessment only if the assessment referendum passes. See TEX. AGRIC. CODE § 74.113(e). Approval of a zone and of the assessment each requires a vote of either two-thirds of the cotton growers in the zone or of those who farm more than one-half of the cotton acreage in the zone. See id. §§ 74.113(d), 74.114(g). The election of board members, on the other hand, requires only a plurality vote. See id. § 74.114(c)(2); 4 TEX. ADMIN. CODE § 3.6(c).

The Foundation exercises broad governmental powers. Besides being authorized to conduct elections in proposed eradication zones, TEX. AGRIC. CODE § 74.108(a)(1), (2), the board may add an area to a zone under certain circumstances if approved by a referendum of cotton growers in the area. Id.

---

1. In 1995, the Legislature extended the Foundation's jurisdiction to include eradication of the "pectinophora gossypiella," or pink bollworm, another cotton pest. See Act of May 8, 1995, 74th Leg., R.S., ch. 227, § 2, 1995 Tex. Gen. Laws 1976.

§ 74.108(b). The board determines what eradication programs to conduct. *Id.* § 74.108(a)(4). The Foundation may impose penalties for late payment of assessments. *Id.* § 74.115(a). A cotton grower who fails to pay an assessment within ten days of its due date must destroy his cotton crop. *Id.* § 74.115(b). If the grower fails to do so, his crop is automatically declared a public nuisance. *Id.* On the Foundation's recommendation, and after notice, the Department of Agriculture must destroy it, even if not infested with boll weevils, at the owner's cost. *Id.* In addition, a cotton grower who violates the statute (including, presumably, by failing to pay an assessment or failing to destroy his own crop if payment is more than ten days late) is guilty of a Class C misdemeanor. *Id.* § 74.126(b). Cotton which a delinquent grower has already produced and harvested is subject to a lien. *Id.* § 74.115(c). Representatives of the Foundation may enter private property which is subject to eradication without the owner's permission for any purpose under the Act, including "the treatment, monitoring, and destruction of growing cotton or other host plants." *Id.* § 74.117. Finally, the Commissioner and the Foundation may adopt rules necessary to carry out the purposes of the Act. *Id.* § 74.120(c).

While growers in a zone must approve their assessments, they do not approve the type of eradication program or the amount of debt incurred by the Foundation to finance it. These matters are left to the Foundation's discretion. If the eradication program is discontinued for any reason, the Foundation may continue collecting assessments "as necessary to pay the financial obligations of the foundation." *Id.* § 74.127(c).

Under the Act, some power is retained by the Commissioner of Agriculture. For example, the Foundation can change the number of board positions or the eradication zone representation on the board only with the Commissioner's approval. *Id.* § 74.107(b). The Commissioner must also make rules to protect life and property from pesticides and other aspects of eradication programs. *Id.* § 74.120. *See* 4 Tex. Admin. Code §§ 3.20–3.24. The Commissioner may prohibit planting cotton in zones when it would jeopardize the success of an eradication program. *Id.* § 74.118. *See* 4 Tex. Admin. Code §§ 3.50–3.57. The Commissioner may exempt a cotton grower from payment of the Foundation's assessment penalties if payment would leave the grower with less than $15,000 taxable income. *Id.* § 74.116. *See* 4 Tex. Admin. Code §§ 3.70–3.81. The Foundation may expend revenue only on "programs approved by the commissioner as consistent with this subchapter and applicable provisions of the constitution." Tex. Agric. Code § 74.109(h). Finally, the Commissioner must determine when elimination of boll weevils is no longer necessary to prevent economic loss to cotton growers. *Id.* §§ 74.102(6), 74.112.

After a referendum has passed, the cotton growers in the zone must be allowed to conduct referenda "periodically" under the terms prescribed in the initial referendum to determine whether to continue their assessments, *id.* § 74.105(f), although the Act says nothing about how often these referenda must occur. In addition, the Foundation must conduct a referendum on whether to discontinue the program on the petition of at least forty percent of the cotton growers in the zone. *Id.* § 74.112(f)–(i). As noted, however, the Foundation may continue to collect assessments previously approved to pay its financial obligations. *Id.* § 74.127(c).

### B

Because the Texas Constitution prohibits occupation taxes on agricultural pursuits, *see* Tex. Const. art. VIII, § 1(c), lawmakers focused on the constitutionality of the Act when considering its passage. *See* Senate Debate on SB 30 (Feb. 3, 1993) (tape 1); House Research Organization Bill Analysis of SB 30 at 9 (Feb. 24, 1993); Senate Natural Resources Committee Public Hearing on SB 30 (Jan. 25, 1993); Senate Subcommittee on Agriculture Hearing on SB 30 (Jan. 27, 1993). In an apparent attempt to preempt any constitutional problems, the Legislature included several references to Article XVI, Section 68 of the Texas Constitution. That section, which creates a limited exception to the ban on agricultural occupation taxes, provides:

The legislature may provide for the advancement of food and fiber in this state by providing representative associations of agricultural producers with authority to collect such refundable assessments on their product sales as may be approved by referenda of producers. All revenue collected shall be used solely to finance programs of *marketing, promotion, research, and education* relating to that commodity.

TEX. CONST. art. XVI, § 68 (emphasis added).[2] The parties do not dispute that the primary purpose of the Act is pest eradication, which is not one of the purposes expressly listed in Section 68. The Legislature nonetheless declared in the statute:

The creation and use of a boll weevil eradication foundation as a vehicle to provide for assessments and governing boards and to establish eradication zones in order to suppress and eradicate boll weevils and other cotton pests are consistent with the goals and uses of revenue established under Article XVI, Section 68, of the Texas Constitution.

TEX. AGRIC. CODE § 74.101(c). In its "Findings and Declaration of Policy," the Legislature further declared that

there exists a need to develop, carry out, and participate in programs of *research* such as disease and insect control; *marketing* to show low risk of pests in interstate and intrastate movement of cotton commodities; *promotion* of pest-free cotton commodities which increase market demand; and *education* of cotton raisers, cotton users, regulators, policymakers, and the general public on the effect of pests on cotton, its utility, its marketing, its yield, and its promotion....

TEX. AGRIC. CODE § 74.101(a)(2) (emphasis added). Also, the statute requires the Foundation to recommend assessments in an amount sufficient to "finance programs of *marketing, promotion, research,* and *education* calculated to increase the production and use of cotton." TEX. AGRIC. CODE

§ 74.113(a) (emphasis added). Although, as discussed in part II below, the Foundation does not now rely on Article XVI, Section 68 to support the eradication programs, it appears that the Legislature attempted to mold the language of the Act to fit within that constitutional provision.

## C

In May 1993, Texas Cotton Producers, Inc., a nonprofit organization representing cotton growers, petitioned the Commissioner for authority to create the Foundation. In its petition, Texas Cotton Producers proposed nine eradication zones around the state and provided that the Foundation board would consist of a corresponding nine members. Texas Cotton Producers further provided that "[o]n creation of the proposed official cotton growers' boll weevil eradication foundation by TCP the initial board will be appointed by the board of TCP pending conduct of the board election."

While the nine-member board is consistent with the requirements of section 74.103(b)(2), which permits a six, nine, twelve, or fifteen person board, the statute never authorizes the creating organization to appoint the initial Foundation board. Despite this flaw, the Commissioner certified Texas Cotton Producers to create the Foundation. In September 1993, Texas Cotton Producers incorporated the Foundation as a Texas nonprofit corporation, appointing nine members to the board who purportedly represented each of the nine proposed eradication districts. The Foundation has since conducted six zone referenda, and in each instance the growers elected as their board representative the person previously appointed by Texas Cotton Producers to represent that proposed zone. In the meantime, the remaining appointed members apparently voted on all Foundation matters, including the setting of assessments and expenditure of funds.

In April 1995, the Foundation conducted a referendum in the proposed High Plains Eradication Zone, which comprises all or

---

2. This provision was adopted in 1983 in response to *Conlen Grain and Mercantile, Inc. v. Texas Grain Sorghum Producers Bd.,* 519 S.W.2d 620 (1975). In *Conlen,* we reviewed the constitutionality of assessments levied against grain sorghum producers to fund research and marketing programs. The Court held that the assessments, even though refundable, constituted a prohibited occupation tax on an agricultural pursuit.

parts of thirty West Texas counties. The cotton growers approved creation of the zone, and also approved the following maximum assessments:

A maximum of $1.25 per planted cotton acre in Armstrong, Bailey, Castro, Cochran, Deaf Smith, Lamb, Parmer, Randall and Swisher Counties, and

A maximum of $1.25 per planted cotton acre and $0.0075 per pound of CFSA [Consolidated Farm Service Agency] established yield per planted cotton acre in Briscoe, Crosby, Floyd, Hale, Hockley, Lubbock, Lynn, Terry and Yoakum counties, and

A maximum of $1.25 per planted cotton acre and $0.0125 per pound of CFSA established yield per planted cotton acre in Andrews, Borden, Dickens, Ector, Gaines, Garza, Howard, Kent, Martin, Midland and Motley Counties.

The following September, ten cotton growers from the High Plains Zone sued the Foundation in district court in Hale County, challenging the validity of the referendum and assessments. The plaintiffs contended that the assessments were an occupation tax on an agricultural pursuit, that the assessments further violated their right to equal protection under the United States and Texas Constitutions, that the penalty provisions of the act violated the right to due process under the United States Constitution and the right to open courts under the Texas Constitution, and that the Legislature improperly delegated authority to the Foundation in violation of the Texas Constitution's separation of powers mandate. The plaintiffs also alleged that, even if the statute is constitutional, the Foundation violated the statute by improperly defining the High Plains Zone, by proposing a nonuniform assessment, and by not providing for subsequent referenda on the referendum ballot. Plaintiffs finally alleged that the Foundation did not comply with the Open Meetings Act.

After discovery, the trial court granted summary judgment for the plaintiffs, without stating specific grounds. The court's final judgment awarded plaintiffs the assessments they had paid, together with their attorneys' fees, and permanently enjoined the Foundation from levying further assessments against the plaintiffs. The Foundation appealed directly to this Court, and we accepted jurisdiction. *See* TEX. GOV'T CODE § 22.001(c); TEX.R.APP. P. 140.

**D**

In April 1994, the Foundation conducted a referendum in the proposed Lower Rio Grande Valley Eradication Zone, which comprises nine South Texas counties. The cotton growers approved creation of the zone, and the following October they approved an assessment of $18 per acre on irrigated land and $12 per acre on unirrigated land. One year later, however, the growers petitioned for another referendum to cancel the program. *See* TEX. AGRIC. CODE § 74.112(f). This referendum passed in January 1996, thus terminating the eradication program in the Lower Rio Grande Valley Zone. The Foundation, however, continued billing growers for the assessments, solely to retire the $9 million debt already incurred for eradication.

In July 1996, thirty-one Lower Rio Grande Valley cotton growers sued the Foundation to enjoin collection of the assessments.[3] The plaintiffs contended that the assessments were occupation taxes on an agricultural pursuit, violating both procedural and substantive due process under the United States Constitution and procedural and substantive due course of law under the Texas Constitution, and that the statute vested unreasonable and excessive power in the Foundation. After an evidentiary hearing, the trial court rendered a temporary injunction enjoining collection of the assessments, which the Foundation also appealed directly to this Court. We accepted jurisdiction and consolidated the two appeals.

**II**

The growers[4] argue that the Act, on its

---

3. Eighty-five additional growers subsequently joined the suit as plaintiffs.

4. "Growers" refers to the High Plains and Lower Rio Grande Valley plaintiffs, unless otherwise indicated.

face and as applied to them,[5] violates Article VIII, Section 1(c) of the Texas Constitution, which provides that "[p]ersons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax." The growers contend that the assessments do not fall under the exception in Article XVI, Section 68 because, among other reasons, the assessments are not refundable as required by that provision.

Because the Foundation concedes that the assessments are not refundable, it does not attempt to support them under Article XVI, Section 68.[6] Instead, the Foundation argues that the assessments are regulatory fees imposed under the State's police power, rather than occupation taxes.

■ As noted, the Legislature referenced Article XVI, Section 68 several times in the Act. However, we reject the growers' argument that an assessment not comporting with Article XVI, Section 68 is automatically void. That the Legislature may have relied primarily on that constitutional provision does not preclude us from considering whether it is valid on another basis. *See Cain v. City of Tyler*, 261 S.W. 1018, 1021 (Tex. Com. App.1924, judgm't adopted); *Bullock v. Texas Skating Ass'n*, 583 S.W.2d 888, 893 (Tex. Civ.App.—Austin 1979, writ ref'd n.r.e.). The Legislature has broad discretion to legislate under its police power, and we must uphold such legislation as long as it is justified by a rational legislative purpose and does not violate a specific constitutional provision. *See State v. Project Principle, Inc.*, 724 S.W.2d 387, 391 (Tex.1987). Fees that are imposed against persons in an industry, when only in an amount reasonably necessary to fund the State's regulation of that industry, are not occupation taxes. *See, e.g., City of Fort Worth v. Gulf Refining Co.*, 125 Tex. 512, 83 S.W.2d 610, 617–618 (1935).

Thus, if the assessments are merely regulatory fees, as the Foundation contends, they are not prohibited by Article VIII, Section 1(c), and the applicability of the restriction in Article XVI, Section 68 is immaterial.

■ We have articulated a "primary purpose" test for determining whether an assessment is an occupation tax or a regulatory fee:

> The principle of distinction generally recognized is that when, from a consideration of the statute as a whole, the primary purpose of the fees provided therein is the raising of revenue, then such fees are in fact occupation taxes, and this regardless of the name by which they are designated. On the other hand, if its primary purpose appears to be that of regulation, then the fees levied are license fees and not taxes.

*H. Rouw Co. v. Texas Citrus Comm'n*, 151 Tex. 182, 247 S.W.2d 231, 234 (1952). *See also Hurt v. Cooper*, 130 Tex. 433, 110 S.W.2d 896, 899 (1937). Because money is fungible, this determination is not controlled by whether the assessments go into a special fund or into the State's general revenue. *See Brown v. City of Galveston*, 97 Tex. 1, 75 S.W. 488, 496–497 (1903).

■ Of course, almost all fees or assessments are intended to raise revenue. The critical issue is whether the assessment is intended to raise revenue *in excess* of that reasonably needed for regulation. *See City of Fort Worth*, 83 S.W.2d at 618; *Producers Ass'n of San Antonio v. City of San Antonio*, 326 S.W.2d 222, 224 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.). For example, in *Producers Association*, the court held that an inspection fee imposed against milk producers was a regulatory fee, not an occupation tax. 326 S.W.2d at 324. The undisputed evidence reflected that the annual cost of inspecting dairies was $38,000, while the in-

---

**5.** Under a facial challenge, the challenging party contends that the statute, by its terms, always operates unconstitutionally. *See Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex.1995). Under an "as applied" challenge, the challenging party contends that the statute, although generally constitutional, operates unconstitutionally as to him or her because of the challenging party's particular circumstances. *Id.* at 518 n. 16.

**6.** One amicus curiae, Farm Credit Bank of Texas, argues that the assessments are refundable, and thus qualify under Article XVI, Section 68, because producers may discontinue the eradication program by referendum and recover, on a pro rata basis, any surplus funds. *See* TEX. AGRIC. CODE § 74.112(e). Because we conclude that the assessments constitute regulatory fees, we do not address this argument.

spection fee generated only about $30,000 annually. *Id.* On the other hand, the court in *City of Houston v. Harris County Outdoor Advertising Ass'n,* 879 S.W.2d 322 (Tex. App.—Houston [14th Dist.] 1994, writ denied), *cert. denied,* —— U.S. ——, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995), held that permit fees levied against billboard owners constituted an occupation tax.[7] The evidence, in the form of a detailed accounting study, reflected that the fees generated revenues equaling from four to ten times the cost of regulation, and thus were intended primarily to raise revenue. 879 S.W.2d at 329.

Here, the growers do not argue that the Foundation's assessments exceed the amount needed for eradication. Rather, they argue that eradication of the boll weevil does not constitute "regulation of the cotton industry" for purposes of applying the primary purpose test. We disagree.

Texas is and has long been the nation's leading cotton producer. *See* UNITED STATES DEP'T OF AGRICULTURE, NATIONAL AGRICULTURAL STATISTICAL SERVICE (1994); TEXAS ALMANAC 1996–1997, 600 (The Dallas Morning News 1995). In 1994, the value of the Texas crop exceeded $1.6 billion, accounting for about one-fourth of the nation's total cotton production. TEXAS ALMANAC 1996–1997 at 600. The House Research Organization concluded when considering the Act that, despite annual expenditures of $23 million for boll weevil control, the pest still causes over $20 million per year in crop losses. *See* HOUSE RESEARCH ORGANIZATION BILL ANALYSIS OF SB 30 at 5 (Feb. 24, 1993). None of the parties or amici disputes the Legislature's characterization of the boll weevil as a "public nuisance." TEX. AGRIC. CODE § 74.001.

◼ The abatement of nuisances is within the regulatory power of the State. *See Pope v. City of Houston,* 559 S.W.2d 905, 907–908 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.). In *Williams v. State,* 146 Tex.Crim. 430, 176 S.W.2d 177 (App.1943), the Court of Criminal Appeals, in reviewing the validity of planting restrictions aimed at controlling the pink bollworm, noted the extreme economic im-

portance of cotton to this State's economy. *See* 176 S.W.2d at 182. The Court accordingly concluded that

> [t]he preservation and protection of [the cotton] industry from destruction or serious injury was a subject properly within the police power of the Legislature of this State.

*Id. See also Kilpatrick v. Compensation Claim Bd.,* 259 S.W. 164, 167 (Tex.Civ.App.—El Paso 1924, no writ) (holding that Pink Bollworm Act was a necessary exercise of the State's police power).

◼ We hold that eradication of the boll weevil is a proper subject for regulation by the State pursuant to its police power. Because the Foundation's assessments are levied in an amount needed to fund the eradication programs, and are used for that purpose, we hold that they are regulatory fees, not occupation taxes.

Our decisions in *H. Rouw Co. v. Texas Citrus Commission,* 151 Tex. 182, 247 S.W.2d 231 (1952), and *Conlen Grain and Mercantile, Inc. v. Texas Grain Sorghum Producers Board,* 519 S.W.2d 620 (Tex.1975), are not to the contrary. In *Rouw,* the Court concluded that assessments levied against citrus growers were taxes, rather than regulatory fees. The assessments were to be used for

> education and research for the purpose of increasing knowledge with respect to Texas citrus fruits and by-products, and protecting Texas citrus fruits from pests and diseases and of finding new uses for Texas citrus fruits and by-products and of improving the quality and yield of such fruit and by-products.

247 S.W.2d at 232. Although some of these uses (*i.e.,* protection from pests and diseases) may be comparable to eradication, the Court in *Rouw* did not specifically focus on whether pest control alone might constitute appropriate police power regulation. Indeed, the Court drew no distinction among the various programs allowed under the statute, presumably because there was no evidence as to how

---

7. A county, city or town may not levy an occupation tax exceeding one-half of the tax levied by the State on that occupation. *See* TEX CONST. art. VIII, § 1(f). Because the State had not taxed billboard owners, the City was prohibited from levying any occupation tax against them.

the assessments were being allocated among them. Instead, the Court viewed the statute as having two overriding purposes: 1) advertising and enlarging the markets for Texas citrus fruit; and 2) funding research beneficial to the citrus industry. *See* 247 S.W.2d at 234. Considering these purposes, the Court concluded that the statute was intended primarily to raise revenue rather than to regulate the citrus industry. *Id.*

In *Conlen,* the Court invalidated assessments levied against grain sorghum producers, concluding that they were agricultural occupation taxes. The Grain Sorghum Board was required to use the assessments for

> developing, carrying out, and participating in programs of research, disease and insect control, predator control, education, and promotion, designed to encourage the production, marketing, and use of [grain sorghum].

519 S.W.2d at 621–22. As in *Rouw,* the Court did not specifically consider whether "disease and insect control" standing alone might be considered a regulatory function. Instead, the Court viewed the statute as primarily intended to *promote* the grain sorghum industry, analogizing it to the statute invalidated in *Rouw. Id.* at 623–24. Accordingly, neither *Rouw* nor *Conlen* stand for the proposition that assessments levied solely to eradicate a public nuisance constitute occupation taxes.

 The growers point out that the Act is not confined to eradication. Rather, the Foundation is also authorized to use the funds for "other programs consistent with the declaration of policy stated in Section 74.101 of this code." TEX. AGRIC. CODE § 74.113(f)(3). Section 74.101 appears to contemplate promotion and marketing programs like the ones at issue in *Conlen* and *Rouw.* We need not decide today, however, whether the Foundation's implementation of marketing or promotional programs would violate the Texas Constitution.[8] The undisputed evidence reflects that, except for a small percentage for overhead, all assessments are spent on eradication. We may not

hold the statute facially invalid simply because it may be unconstitutionally applied under hypothetical facts which have not yet arisen. *See Texas Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 518 (Tex. 1995).

 The growers also argue that the Act cannot be considered regulatory because the assessments are levied uniformly against all cotton producers in a zone, regardless of whether that producer's crop is actually infested with boll weevils. We disagree. Several cotton growers' associations assert in amicus briefs that, because the boll weevil may migrate from field to field, a successful eradication program must be coordinated on a regional basis without regard to individual infestation. This proposition, which the growers do not dispute, is reflected in the legislative scheme.

We note that the Lower Rio Grande Valley case is factually distinguishable in that the assessments there are being used to retire a bank loan, rather than to fund ongoing eradication. However, this does not negate the regulatory character of the assessments. There is no dispute that the money which the Foundation borrowed for the Lower Rio Grande Valley Zone was used for eradication. That funds for the program were advanced by a lending institution, rather than paid for directly from the assessments, does not change the essential purpose of the assessments.

For the foregoing reasons, we hold that the assessments levied in the High Plains Zone and in the Lower Rio Grande Valley Zone are regulatory fees, rather than occupation taxes. The Act thus does not violate Article VIII, Section 1(c) of the Texas Constitution, either facially or as applied to the growers.

### III

The growers also argue that the Act, on its face and as applied to them, violates their right to procedural due process under the United States Constitution and their right to

---

8. The Foundation concedes that programs other than eradication "arguably" would have to comply with Article XVI, Section 68.

open courts under the Texas Constitution because it does not adequately allow them to challenge the Foundation's assessments.

The Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law. . . ." U.S. CONST., amend. XIV, § 1. This due process guarantee requires states to provide a meaningful postdeprivation remedy, and in some instances a predeprivation remedy, to a person challenging the validity of a fee or assessment. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 10–14 at 720–21 (2d ed. 1988). The Texas Constitution guarantees that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. This guarantee ensures citizens access to courts "unimpeded by unreasonable financial barriers." *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 448 (Tex.1993). Thus, the Legislature may not require a taxpayer to prepay a tax before challenging its validity. *Id.* at 449–450.

The Act provides that "[a] cotton grower who fails to pay an assessment levied under this subchapter when due may be subject, after reasonable notice, to a penalty set by the board." TEX. AGRIC. CODE § 74.115(a). "A cotton grower who fails to pay all assessments and penalties before the 10th day after receiving notice of the delinquency shall destroy any cotton growing on the grower's acreage that is subject to the assessment." *Id.* § 74.115(b). Cotton plants that are not destroyed are declared to be a "public nuisance," and the Department of Agriculture may apply to a district court to have them destroyed. *Id.* Moreover, the statute appears to require the Department, on the Foundation's recommendation and after seven days' notice, to enter a grower's premises and destroy the crop even without a court order. *See id.* §§ 74.004(c), 74.115(b). Although the Commissioner's regulations provide a procedure for challenging a penalty, *see* 4 TEX. ADMIN. CODE § 3.57, neither the Act nor the regulations provide a method for a grower to challenge the underlying assessments or the destruction of his or her crop.

The statute also allows the Department to perfect a lien on a delinquent grower's harvested cotton. *See id.* § 74.115(c).

While the growers raise a serious question as to whether the Act violates their constitutional rights to open courts and procedural due process, I do not attempt to resolve this issue because the Court holds the Act unconstitutional on other grounds.

## IV

The growers also complain that the Act, on its face and as applied to them, violates their right to equal protection under Article I, Section 3 of the Texas Constitution and the Fourteenth Amendment to the United States Constitution. Under the Act, producers in a participating zone may be assessed even though they have no actual boll weevil infestation, while producers in another zone with infestation may pay no assessment because that zone elected not to participate. Also, the producers in different zones may pay different levels of assessments.

The Legislature has broad discretion in enacting social or economic legislation that does not classify on suspect categories, such as race, or impinge on fundamental rights. Under both federal and state equal protection analysis, such legislation is valid as long as it is rationally related to a legitimate state interest. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–3255, 87 L.Ed.2d 313 (1985); *Richards v. League of United Latin American Citizens*, 868 S.W.2d 306, 310–311 (Tex. 1993). No party contends that more heightened scrutiny is appropriate.

The Act satisfies these requirements. As discussed previously, the Legislature could have reasonably concluded that eradication, to be effective, should be conducted uniformly over a broad area without regard to individual infestation. Also, the referendum system which the Legislature adopted is not irrational, as it allows those persons most familiar with the boll weevil problem in each area—the cotton producers—to decide whether to participate in the eradication program. The equal protection clause is not, without more, violated merely

because a law treats different geographic regions or political subdivisions differently, or because it allows political subdivisions the discretion to adopt or reject a statutory scheme. *See Richards,* 868 S.W.2d at 311–312. We thus hold that the Act, on its face and as applied to the growers, does not violate their right to equal protection.

Next, the growers assert that the categories drawn by the Legislature violate substantive due process under the Fourteenth Amendment to the United States Constitution. As they do not offer a substantive due process analysis that differs from, or affords greater relief than, their equal protection argument, we also reject this claim.[9]

■■■■ Moreover, the growers contend that, because of the statute's classifications, it is a local or special law in violation of Article III, Section 56 of the Texas Constitution. A local law is limited to a specific geographic region of the State, while a special law is limited to a particular class of persons distinguished by some characteristic other than geography. *See Maple Run at Austin Munic. Utility Dist. v. Monaghan,* 931 S.W.2d 941, 945 (Tex.1996). Legislation does not violate Article III, Section 56, however, as long as there is a reasonable basis for its classifications. *Id.* As explained above, the Act satisfies this test.

### V

Finally, we turn to the growers' argument that the Legislature violated Article II, Section 1 of the Texas Constitution, requiring the separation of powers between the legislative, executive, and judicial branches, by improperly delegating governmental authority to the Foundation. In particular, the growers contend that the Foundation is a private entity whose directors are neither constrained before they act by meaningful standards nor made accountable after they act by administrative, judicial, or popular review. In response, the Foundation contends that both the Legislature's guidelines and the Commissioner of Agriculture's supervisory authority are constitutionally adequate.

### A

■■■ "The delegation of legislative power is an old concern...." Peter H. Aranson et al., *A Theory of Legislative Delegation,* 68 CORNELL L.REV. 1, 4 (1982). A century before American independence, John Locke articulated the theoretical imperative for preserving legislative power in the legislative branch:

The *Legislative cannot transfer the Power of Making Laws* to any other hands. For it being but a delegated Power from the People, they, who have it, cannot pass it over to others.... And when the people have said, We will submit to rules, and be govern'd by *Laws* made by such Men, and in such Forms, no Body else can say other Men shall make *Laws* for them; nor can the people be bound by any *Laws* but such as are Enacted by those, whom they have Chosen, and Authorized to make *Laws* for them. The power of the *Legislative* being derived from the People by a positive voluntary Grant and Institution, can be no other, than what the positive Grant conveyed, which being only to make *Laws,* and not to make *Legislators,* the *Legislative* can have no power to transfer their Authority of making laws, and place it in other hands.

JOHN LOCKE, SECOND TREATISE OF GOVERNMENT 380–381 (2d Treatise) (Cambridge University Press 1960). The prohibition on unwarranted delegation of lawmaking power is "rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States,* 488 U.S. 361, 371, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989). The United States Constitution expressly vests legislative power in the Congress, *see* U.S. CONST. art. I, § 1, and the Texas Constitution similarly vests legislative power in our Legislature. *See* TEX. CONST. art. II, § 1; art. III, § 1. Thus, "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is vested." *A.L.A. Schechter Poultry Corp. v. United States,* 295

---

9. The Lower Rio Grande Valley growers also argue that the Legislature violated federal substantive due process by delegating overly broad authority to the Foundation. The growers' delegation argument is discussed in Part V of this opinion.

U.S. 495, 529, 55 S.Ct. 837, 843, 79 L.Ed. 1570 (1935). Likewise, in our State "[t]he power to pass laws rests with the Legislature, and that power cannot be delegated to some commission or other tribunal." *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 941 (1935).

Yet, like many truisms, these blanket pronouncements should not be read too literally. Even in a simple society, a legislative body would be hard put to contend with every detail involved in carrying out its laws; in a complex society it is absolutely impossible to do so. Hence, legislative delegation of power to enforce and apply law is both necessary and proper. *E.g., Field v. Clark*, 143 U.S. 649, 693–694, 12 S.Ct. 495, 504–505, 36 L.Ed. 294 (1892). Such power must almost always be exercised with a certain amount of discretion, and at times the line between making laws and enforcing them may blur. As Justice Scalia has observed:

> Once it is conceded, as it must be, that no statute can be entirely precise, and that some judgments, even some judgments involving policy considerations, must be left to the officers executing the law and to the judges applying it, the debate over unconstitutional delegation becomes a debate not over a point of principle but over a question of degree. As Chief Justice Taft expressed the point for the Court in the landmark case of *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928), the limits of delegation "must be fixed according to common sense and the inherent necessities of the governmental co-ordination." Since Congress is no less endowed with common sense than we are, and better equipped to inform itself of the "necessities" of government; and since the factors bearing upon those necessities are

both multifarious and (in the nonpartisan sense) highly political ... it is small wonder that we have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgments that can be left to those executing or applying the law.

*Mistretta*, 488 U.S. at 415–416, 109 S.Ct. at 677 (Scalia, J., dissenting). While warning against "allowing delegation of power to exercise unguided discretion in individual cases," Professor Davis points out that "the kind of government we have developed could not operate without" allowing legislatures to delegate rulemaking authority to administrative bodies. KENNETH CULP DAVIS, 1 ADMINISTRATIVE LAW TREATISE § 3.1, at 150 (2d ed. 1978). And at the height of the New Deal, a young Louis Jaffe asserted:

> It was said by the courts for many years that Congress could not "delegate" its powers to administrative officers, though it could give them power "to fill up the details". But that use of language has worn thin and become rather preposterous, and it is now admitted that Congress may "delegate" power to public officers, since there is no specific constitutional prohibition against delegation as such, provided the delegation is properly prescribed and is felt to be necessary to the operation of government. In the same way we may restate the question in this field as one of "proper delegation" or "reasonable delegation", or we might drop the word "delegation" completely, at least as indicating a constitutional category, and regard the question simply as one of reasonableness within the due process clause.

Louis L. Jaffe, *Law Making by Private Groups*, 51 HARV. L. REV. 201, 248 (1937).[10]

---

**10.** Delegations have sometimes been attacked on substantive due process or due course grounds, rather than under separation of powers, on the theory that the statute or ordinance allows the delegate, whether it be an administrative agency or a segment of the population, to exercise governmental power arbitrarily. *See, e.g., City of Eastlake v. Forest City Enter.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928); *Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57

L.Ed. 156 (1912); *Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d 278 (1960); *Spann v. City of Dallas*, 111 Tex. 350, 235 S.W. 513 (1921).

For example, the ordinance at issue in *Roberge* prohibited operation of a philanthropic home for the elderly unless two-thirds of the property owners within 400 feet of the proposed home consented. Because the neighbors were "free to withhold consent for selfish reasons or arbitrarily and [could] subject the [applicant] to their will or caprice," the Court concluded that the delegation of power violated due process. 278 U.S. at 122,

Even before the Depression, one state court noted: "It only leads to confusion and error to say that the power to fill up the details and promulgate rules and regulations is not legislative power." *State ex rel. Wisconsin Inspection Bureau v. Whitman*, 196 Wis. 472, 220 N.W. 929, 941 (1928).

Even in its heyday, the nondelegation doctrine was sparingly applied, having been used by the United States Supreme Court to strike down a federal statute only three times. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). Since the Court retreated from its opposition to New Deal initiatives, it has consistently upheld congressional delegations. *See, e.g., Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939); *National Broad. Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), *Skinner v. Mid–America Pipeline Co.*, 490 U.S. 212, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989); *Touby v. United States*, 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991).

Texas courts have also generally upheld legislative delegations to state or municipal agencies. We most recently did so in *Edge-wood Independent School District v. Meno*, 917 S.W.2d 717, 740–741 (Tex.1995), where we said:

> The Texas Legislature may delegate its powers to agencies established to carry out legislative purposes, as long as it establishes "reasonable standards to guide the entity to which the powers are delegated." *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992) (quoting *State v. Texas Mun. Power Agency*, 565 S.W.2d 258, 273 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ dism'd)). "Requiring the legislature to include every detail and anticipate unforeseen circumstances would ... defeat the purpose of delegating legislative authority." *Id.*

> \* \* \* \* \* \*

> The separation of powers clause [TEX. CONST. art. II, § 1] requires that the standards of delegation be "reasonably clear and hence acceptable as a standard of measurement." *Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d [278,] 280 [ (1960) ].

*See also Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679 (Tex.1992); *Jordan v. State Board of Ins.*, 160 Tex. 506, 334 S.W.2d 278 (1960); *Southwestern Sav. & Loan Ass'n v. Falkner*, 160 Tex. 417, 331 S.W.2d 917 (1960); *Railroad Comm'n v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956); *Texas Turnpike Auth. v. Shepperd*, 154 Tex. 357, 279 S.W.2d 302 (1955); *Parker v. San Jacinto County Water Control and Improv. Dist.*, 154 Tex. 15, 273 S.W.2d 586 (1954); *Gillaspie v. Department of Pub. Safety*, 152 Tex. 459, 259 S.W.2d 177 (1953),

---

49 S.Ct. at 52. Similarly, this Court in *Spann* invalidated a Dallas city ordinance prohibiting business use of property in a residential district unless the owner obtained consent from three-fourths of the district property owners. The Court concluded that the true purpose of the ordinance "is not to protect the public health, safety or welfare from any threatening injury from a store, but to satisfy a sentiment against the mere presence of a store in a residence part of the City." 235 S.W. at 516. In *Jordan*, the Court rejected a due course of law challenge to a statute allowing the State Board of Insurance to prohibit carriers from doing business if their officers were "not worthy of the public confidence." 334 S.W.2d at 279. The Court concluded that "the idea embodied within the phrase is reasonably clear and hence acceptable as a standard of measurement." *Id.* at 280.

More commonly, however, Texas has rooted its delegation jurisprudence only in the principle of separation of powers. *See, e.g., Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717 (Tex.1995); *Housing Auth. v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79 (1940); *Texas Nat. Guard Armory Bd. v. McCraw*, 132 Tex. 613, 126 S.W.2d 627 (1939); *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935 (1935). Because we find that the delegation of authority to the Foundation violates the principle of separation of powers, we do not reach the question of whether it may also violate federal substantive due process.

*cert. denied,* 347 U.S. 933, 74 S.Ct. 625, 98 L.Ed. 1084 (1954); *Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424 (1946); *Texas National Guard Armory Bd. v. McCraw,* 132 Tex. 613, 126 S.W.2d 627 (1939); *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 83 S.W.2d 935 (1935); *Housing Auth. v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79 (1940). Many decisions of our Court of Criminal Appeals and courts of appeals have also upheld such delegations. *See, e.g., Masquelette v. State,* 579 S.W.2d 478 (Tex.Crim. App.), *cert. denied,* 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979); *Ex parte Granviel,* 561 S.W.2d 503 (Tex.Crim.App.1978); *Office of Pub. Ins. Counsel v. Texas Auto. Ins. Plan,* 860 S.W.2d 231 (Tex.App.-Austin 1993, writ denied); *Med–Safe Inc. v. State,* 752 S.W.2d 638 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Public Util. Comm'n v. City of Austin,* 728 S.W.2d 907 (Tex.App.— Austin 1987, writ ref'd n.r.e.); *Oxford v. Hill,* 558 S.W.2d 557 (Tex.Civ.App.—Austin 1977, writ ref'd); *Williams v. State,* 514 S.W.2d 772, 774 (Tex.Civ.App.—Beaumont 1974, writ ref'd n.r.e.); *Martinez v. State Bd. of Med. Examiners,* 476 S.W.2d 400 (Tex.Civ.App.— San Antonio, writ ref'd n.r.e.), *cert. dismissed,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972); *Commissioners' Court of Lubbock County v. Martin,* 471 S.W.2d 100 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.); *Beall Med. Surgical Clinic & Hosp. v. Texas State Bd. of Health,* 364 S.W.2d 755 (Tex.Civ.App.—Dallas 1963, no writ).

But there are some indications that extreme judicial deference to legislative delegation may be declining. A number of Supreme Court justices have emphasized the need for adequate legislative standards. For example, Justice Brennan has cautioned: "Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsive in the same degree to the people." *United States v. Robel,* 389 U.S. at 276, 88 S.Ct. at 430 (Brennan, J., concurring). *See also American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 543–548, 101 S.Ct. 2478, 2507–2510, 69 L.Ed.2d 185 (1981)

(Rehnquist, J., dissenting); *Arizona v. California,* 373 U.S. 546, 624–627, 83 S.Ct. 1468, 1510–1512, 10 L.Ed.2d 542 (1963) (Harlan, J., dissenting in part). Moreover, "[m]any distinguished scholars and judges [have become] so concerned about the enormous discretionary power of agencies that they [have] urged reinvigoration of the doctrine." KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., 1 ADMINISTRATIVE LAW TREATISE § 2.6, at 74 (3d ed. 1994) (citing Aranson et al., *supra* at 7–17; J. ELY, DEMOCRACY AND DISTRUST 132– 134 (1980); J. FREEDMAN, CRISIS AND LEGITIMACY: THE ADMINISTRATIVE PROCESS AND AMERICAN GOVERNMENT 93–94 (1978); McGowan, *Congress, Court, and Control of Delegated Power,* 77 COLUM. L.REV. 1119 (1977); T. LOWI, THE END OF LIBERALISM: THE SECOND REPUBLIC OF THE UNITED STATES 93 (1969)). *See also* Book Note, *Delegation Without Accountability,* 108 HARV. L.REV. 751 (1995); Marci A. Hamilton, *Power, Responsibility, and Republican Democracy,* 93 MICH. L.REV. 1539 (1995) (Book Review); Harold J. Krent, *Delegation and Its Discontents, Power Without Responsibility, David Schoenbrod,* 94 COLUM. L.REV. 710 (1994); David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?,* 83 MICH. L.REV. 1223 (1985).

State courts may have less need to reinvigorate the doctrine, since they have historically been more comfortable with striking down state laws on this basis than their federal counterparts. *See* DAVIS § 3.14, at 204 (2d ed. 1978). Texas courts are no exception. In particular, this Court has been especially willing to strike down delegations of legislative authority to the judicial department. *See, e.g., Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427 (Tex.1963); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699 (1959); *Daniel v. Tyrrell & Garth Inv. Co.,* 127 Tex. 213, 93 S.W.2d 372 (1936). And in *Texas Antiquities Committee v. Dallas County Community College District,* 554 S.W.2d 924 (Tex.1977), a plurality of four justices would also have struck down a delegation to an administrative agency. They believed that the Antiquities Committee's charge to prevent demolition of "[a]ll buildings ... and locations of historical ... inter-

est," *see* TEX.REV.CIV. STAT. art. 6145–9, § 6 (repealed by Acts 1977, 65th Leg., ch. 871, art. I, § 2(a)(4)) was so vague that it failed to provide reasonable standards to support the delegation. 554 S.W.2d at 927. A fifth justice joined only in the judgment on the alternative ground that no substantial evidence supported the Committee's action, thus avoiding the constitutional issue. 554 S.W.2d at 931 (Greenhill, C.J., concurring). In *Bullock v. Calvert,* 480 S.W.2d 367 (Tex.1972), the Court refused to read a statute as allowing the Secretary of State to decide whether state funds should be used for a political party's primary elections, because such unbridled discretion would violate the delegation doctrine. As Justice Reavley explained for a unanimous Court:

> [T]he effect of this degree of implied authority would be to give the Secretary of State the decision on whether or not state funds should be used for party primary elections and, if so, for what particular expenses and to what extent. This would be an unconstitutional delegation of legislative power in violation of the separation of powers section (Art. 2, § 1) of the Constitution.

480 S.W.2d at 372. In *Ex parte Leslie,* 87 Tex.Crim. 476, 223 S.W. 227 (1920), the Court of Criminal Appeals invalidated a statute empowering the Live Stock Commission to create a penal offense for failing to dip cattle for fever ticks, holding that the law failed to reasonably guide the Commissioner in defining the elements of the offense. *See also Ex parte Maynard,* 101 Tex.Crim. 256, 275 S.W. 1070 (1924); *Ex parte Humphrey,* 92 Tex.Crim. 501, 244 S.W. 822 (1922); *International Ass'n of Firefighters v. City of Kingsville,* 568 S.W.2d 391 (Tex.Civ.App.— Corpus Christi 1978, writ ref'd n.r.e.); *In re Johnson,* 554 S.W.2d 775 (Tex.Civ.App.— Corpus Christi 1977), *writ ref'd n.r.e.,* 569 S.W.2d 882 (Tex.1978) (per curiam).

### B

As difficult as the issue of proper legislative delegation may be, the considerations are even more complex when the delegation is made not to another department or agency of government, but to a private individual or group. While at first blush such delegations might seem manifestly unconstitutional, further reflection demonstrates that they also are frequently necessary and desirable. Presumably no one would argue that the state should not accord the full benefits and responsibilities of a marital union to a couple who was married by a minister, priest, or rabbi rather than a judge. *See* TEX. FAM. CODE § 1.83(a). Also, the delegation of authority to private associations to promulgate certain industrial and professional standards has been of immense benefit to the public. For example, a number of states have adopted existing or future versions of the National Electrical Code, promulgated by an industry association, "turning a technical and complex task often quite beyond the competence of many city councils or even state legislatures over to a specialized private group." David M. Lawrence, *Private Exercise of Governmental Power,* 61 IND. L.J. 647, 689 (1986).

■ Still, private delegations clearly raise even more troubling constitutional issues than their public counterparts. On a practical basis, the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served. More fundamentally, the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government. Thus, we believe it axiomatic that courts should subject private delegations to a more searching scrutiny than their public counterparts. *See* George W. Liebmann, *Delegation to Private Parties in American Constitutional Law,* 50 IND. L.J. 650, 659 (1975) ("Where a delegation by virtue of its content or breadth calls into question the future operation of the political process, judicial scrutiny seems warranted.").

While the United States Supreme Court has upheld many statutes involving some degree of private delegation, *see, e.g., City of Eastlake v. Forest City Enterprises,* 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); *Sunshine Anthracite Coal Co. v. Adkins,* 310

U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *United States v. Rock Royal Co-op., Inc.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), state courts have frequently invalidated such provisions. *See, e.g., Sedlak v. Dick,* 256 Kan. 779, 887 P.2d 1119, 1134–35 (1995) (striking down statute allowing committee of union and business representatives to select Workers' Compensation Board members); *City of Chamberlain v. R.E. Lien, Inc.,* 521 N.W.2d 130, 132–133 (S.D.1994) (striking down statute requiring city to incorporate American Institute of Architects' standard form as part of municipal contracts); *Stewart v. Utah Public Serv. Comm'n,* 885 P.2d 759, 775–776 (Utah 1994) (striking down statute allowing public utility to veto rate regulation plan adopted by Public Service Commission). Unfortunately, scholars have concluded that these cases do not yet, when taken together, evince a coherent constitutional standard. When Professor Davis issued the second edition of his treatise, for example, he abandoned his earlier effort to analyze the state law on private delegations "because identifiable principles do not emerge." DAVIS § 3.12, at 196 (2d ed. 1978). *See also* Lawrence, *supra* at 650. We thus begin our analysis with full recognition that, if the delegation at issue is to a private entity, we must craft our own criteria to judge its constitutionality.

### C

We first address whether the Foundation is a public or private entity for purposes of the nondelegation doctrine. Before ever being subject to its authority, any grower will already have had the right to participate in one or more referenda deciding whether to ratify the zone, who to elect to the board, and what amount is to be assessed on the grower's acreage. These referenda are not purely private affairs, being conducted according to state law, *see* TEX. AGRIC. CODE §§ 74.105, 74.106, 74.113, under rather extensive regulations promulgated by the Commissioner of Agriculture. *See* 4 TEX. ADMIN. CODE §§ 3.1–3.6. For example, the Commissioner approves the ballots, *id.* § 3.4(a), verifies the results, *id.* § 3.5(b), and issues certificates of election to the prevailing board candidates.

*Id.* § 3.6(d). Yet they are not popular elections either, as the suffrage is strictly limited to eligible growers. *Id.* § 3.1.

Similarly, the statutory provisions as to governmental powers suggest both public and private attributes. The Act exempts the Foundation from taxation and affords state indemnification to its board members. *See* TEX. AGRIC. CODE § 74.109(d). The Foundation's board members, officers, and employees have official immunity except for gross negligence, criminal conduct, or dishonesty. *See id.* § 74.110. The Foundation must adopt and publish its rules in accordance with state requirements, *see id.* § 74.120(c), it may be dissolved by the Commissioner when its purpose has been fulfilled, *see id.* § 74.127, and it (or at least its board) is subject to Chapter 325 of the Texas Government Code, the Texas Sunset Act. *Id.* The Legislature specifically denominates the Foundation a "governmental unit" for purposes of immunity from suit under the Tort Claims Act. *Id.* § 74.109(f). Finally, the Foundation does not dispute that it is a "governmental body" subject to the Texas Open Meetings Act. *See* TEX. GOV'T CODE § 551.001(3).

For many purposes, however, the Foundation is *not* a state agency. *See* TEX. AGRIC. CODE § 74.109(d). Thus, the funds the Foundation collects are expressly "not state funds and are not required to be deposited in the state treasury." *Id.* § 74.109(e). The Act also does not subject the Foundation to state purchasing or audit requirements, and its board members are not required to take oaths of office. Finally, there is no provision for administrative appeal from Foundation decisions, except as to penalties imposed for nonpayment of assessments. *See* 4 TEX. ADMIN. CODE § 3.57.

■ In sum, we do not find it easy to categorize the Foundation as either a public or private agency, a difficulty that may exist with many contemporary bodies. *Cf. American Home Assurance v. Texas Dep't of Ins.,* 907 S.W.2d 90, 95 and n. 8 (Tex.App.—Austin 1995, writ denied) (Texas Workers' Compensation Insurance Fund a state agency despite various private attributes). However, courts

have universally treated a delegation as private where "interested groups have been given authoritative powers of determination, usually in conjunction with a public administrative agency." Jaffe, *supra* at 234, and cases cited therein at 234–253. *See also* Lawrence, *supra* at 648 n. 4 ("Difficulties in distinguishing between public and private actors have rarely arisen in the cases and need not long detain us."). That the decisionmakers are elected, that their decisions affect only those they represent, that they exercise police power, or that the government constrains their power by advance restriction or subsequent review may all, as we shall see, be relevant in assessing the validity of the private delegation; but they do not keep it from being considered private in nature. Because the Act delegates authoritative power to private interested parties, we conclude that it is a private entity for purposes of applying the nondelegation doctrine.

### D

Now we must determine what standard to apply in determining whether the private delegation was appropriate. Because of the additional risks posed by such delegations to the proper separation of governmental powers, a number of factors should be considered by a reviewing court. Among those suggested by Professor Jaffe are these:

* Must the consent of an administrative officer be secured at some point in the process?

* Is the action of the delegates reasonable?

* Do all the persons to be affected by an action participate in its determination?

* Could a statutory standard be articulated which "would improve the result or lay the basis for judicial control?"

* Are democratic procedures available to provide "unorganized groups—who may even be a majority—with an opportunity" to prevent oppression by an organized interest group?

*See* Jaffe, *supra* at 247–53.

Forty years after Jaffe, attorney George Liebmann suggested weighing these factors regarding a private delegation:

Does the statute confer upon private delegates the power not only to make rules but to apply the law to particular individuals? Are the actions of private delegates subject to no further public or judicial review, or to review only upon attenuated standards such as the substantial evidence rule? Are the private delegates chosen by a process involving public consent, as by nomination or confirmation by elected officials? Are the private delegates sworn to oaths of office? Do the private delegates have pecuniary interests in the determinations to be made? Is a power to define criminal acts or impose penal sanctions delegated? Is the delegation one of powers threatening the state's monopoly of violence, or one of a breadth and scope threatening the ultimate corrective powers of the legislature? Is the delegation, if one of administrative powers or financial resources, one in which the delegates and their powers are defined according to a limited number of objective standards, or is it rather one which accords the government broad powers to pick and choose among prospective delegates?

Liebmann, *supra* at 717–18.

Even more recently, Professor Lawrence proposed a similar list of "mechanisms that might be used to minimize the possibility that a private delegate's private interest will overwhelm decisionmaking." Lawrence, *supra* at 686. If these considerations are transformed into questions, they would roughly be as follows:

* Are the private delegates largely disinterested, like most arbitrators and some scientific consultants, or do they have a private interest in the results of their decisions?

* Are the interests of the private delegates largely parallel to those of an alternate public actor, as in prevailing wage rate laws, or do they diverge?

* Do the private delegations incorporate all viewpoints into their structure, as

with the National Electrical Code of the National Fire Protection Association, whose members include "electrical contractors, inspectors, manufacturers, utilities, testing laboratories, regulatory agencies, insurance organizations, organized labor, and consumer groups"?

* Do the private delegations include all affected groups in their structure, as did the early twentieth century fire loss salvage corps or the nineteenth century frontier mining camp claim procedures?

* May the determinations of private delegates be appealed to or reviewed by the state?

* Is one who is harmed by the actions of a private delegate entitled to sue a fiscally responsible person or entity, as in laws making private employers liable for the acts of off-duty policemen they employ?

* Are the state's standards sufficient "to guide the delegate in his work and perhaps permit judicial review of his actions"?

* Do the private delegates afford those affected by their decisions the same types of process guarantees as a state actor would provide?

* Do the private delegates possess special qualifications or training for the tasks delegated to them?

*See* Lawrence, *supra* at 686–94.

From his generally fruitless examination of private delegation cases in state courts, Professor Davis concludes: "The one generalization that may be worthy of repetition is this simple one: Much more likely to be sustained than statutes conferring the power of choice upon private parties are statutes whose operation depends upon private action which is taken for purposes which are independent of the statute." DAVIS § 3.12, at 196 (2d ed.1978).

▪ The only test that has been articulated by a Texas court in assessing the validity of a private delegation is this: "The delegation of authority to private entities may be lawful if the legislative purpose is discernible and there is protection against the arbitrary exercise of power." *Office of Public Ins. Counsel v. Texas Auto. Ins. Plan*, 860 S.W.2d 231, 237 (Tex.App.—Austin 1993, writ denied). *See also Central Power and Light Co. v. Sharp*, 919 S.W.2d 485, 492 (Tex. App.—Austin 1996), *writ denied per curiam*, WL 126855, —— S.W.2d —— (Tex.1997). This language, which is paraphrased from Professor Davis' explanation of one part of a proposed five-part test for a new public delegation standard, DAVIS § 3.15, at 208 (2d ed. 1978), is not incorrect, but seems too conclusory to give much assistance in striking the proper balance between important but competing interests and principles. Therefore, we prefer to condense the various inquiries posed by scholars and courts to these eight factors:

1. Are the private delegate's actions subject to meaningful review by a state agency or other branch of state government?

2. Are the persons affected by the private delegate's actions adequately represented in the decisionmaking process?

3. Is the private delegate's power limited to making rules, or does the delegate also apply the law to particular individuals?

4. Does the private delegate have a pecuniary or other personal interest that may conflict with his or her public function?

5. Is the private delegate empowered to define criminal acts or impose criminal sanctions?

6. Is the delegation narrow in duration, extent, and subject matter?

7. Does the private delegate possess special qualifications or training for the task delegated to it?

8. Has the Legislature provided sufficient standards to guide the private delegate in its work?

We emphasize at the outset that these standards apply only to private delegations, not to the usual delegation by the Legislature to an agency or another department of government. In reviewing a public delegation, we adhere to those factors set forth by this Court in *Housing Authority of City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 87 (1940), and its progeny. Furthermore, nothing in our analysis should be

read as suggesting what provisions of the Act would or would not pass muster were this a public delegation. Likewise, we express no opinion as to whether any of the other statutory enactments cited by the dissenting justices would or would not pass constitutional muster. Thus, in no way does our opinion, as the dissenting justices fear, "ultimately threaten the heretofore established role of quasi-governmental entities under Texas law." 952 S.W.2d at 491.

Before applying these factors, we also note that the growers have not expressly categorized their nondelegation argument as either a facial challenge or an "as applied" challenge. We conclude that it is a facial challenge. The growers argue that, based on the overall statutory structure, the Foundation's assessment, collection, and expenditure of funds for eradication violates the separation of powers mandate of our Constitution. Thus, under the growers' argument, the Foundation lacks authority to perform its core function—collecting assessments and conducting mandatory eradication programs—as to any cotton producer, regardless of that producer's particular circumstances. We will thus facially review the legislative delegation before us in light of the above eight factors.

First, while the Foundation is subject to some oversight by the Commissioner of Agriculture, the review is uneven and incomplete. The Legislature did direct the Commissioner to promulgate rules regarding certain areas of the Foundation's operations. The Commissioner is required to adopt rules for the zone referenda and board elections, *see* TEX. AGRIC. CODE § 74.114(c), rules specifying hardship exemptions from assessment penalties, *see id.* § 74.116(a), and rules "to protect individuals, livestock, wildlife, and honeybee colonies" in eradication areas. *Id.* § 74.120. The Commissioner has complied with these directives. *See* 4 TEX. ADMIN. CODE §§ 3.1– 3.6, 3.20–3.24, 3.70–3.71. Indeed, the Commissioner's regulations relating to the protection of human life and the environment are fairly extensive. *See id.* § 3.24. The Act also provides that the Commissioner *may* adopt rules regulating cotton planting in eradication zones and adopting a schedule of penalty fees, *see id.* § 74.118, which he has also done. *See* 4 TEX. ADMIN. CODE §§ 3.50– 3.57.

The Commissioner could not, however, adopt any procedure for reviewing such critical decisions as the amount of assessments adopted by the growers, the total amount of funds expended on eradication, the amount of debt incurred by the Foundation, or the repayment terms for such debts. Nor has the Commissioner attempted to do so, either at the Act's inception or after the increase in his rulemaking authority in 1995. *See* TEX. AGRIC. CODE § 74.120(c) (amended by Acts 1995, 74th Leg., ch. 76, § 11.02). The dissenting justices rely on the proviso that the Foundation must expend revenue only on "programs approved by the commissioner as consistent with this subchapter," TEX. AGRIC. CODE § 74.109(h), but "programs" cannot be stretched to include these critical factors. These determinations are left exclusively to the growers and the board, excluding the Commissioner or any state agency from meaningful review.

Finally, contrary to the dissenting justices' conclusion, the Commissioner has no general authority to "revoke the Foundation's certification" if it fails to comply with the procedural provisions of the Act. 952 S.W.2d at 496. The Act provides that "[t]he commissioner shall certify the petitioning organization selected under Section 74.103 of this code as the organization authorized to create an official boll weevil eradication foundation. . . . The commissioner may revoke the organization's certification on 60 days written notice if the organization fails to meet the requirements of this subchapter." TEX. AGRIC. CODE § 74.104(a), (b). It is clear that this section authorizes the Commissioner to revoke only the authority of the *creating* organization. Once the Foundation is created as an independent entity, the Commissioner has no authority to dissolve it, except when its eradication purpose has been fulfilled or it has become inoperative and abandoned. *Id.* § 74.127. Thus, the first factor weighs against the delegation.

Judging the statute as it is written, rather than as it operated in practice, the second factor militates in favor of the private delega-

tion. The growers in each zone are allowed to vote on whether to participate in the eradication program, and thereby subject themselves to the Foundation's jurisdiction, and are allowed to approve or reject any proposed assessment. Although the Foundation in actuality operated for nineteen months with a board controlled by Texas Cotton Producers' appointees, this process was inconsistent with the statutory contemplation that the Foundation should at all times by governed by the elected board. We thus do not consider that actual operation in reviewing the constitutionality of the Act.[11]

The third factor weighs against the delegation. Far from merely devising eradication guidelines, the Foundation actually applied the programs it devised to all growers in zones where the program was approved. In accordance with its statutory authority, the Foundation collected assessments from individual growers and entered those growers' property to carry out its eradication programs. *See* TEX. AGRIC. CODE § 74.117.

The fourth factor also weighs against the delegation. The Foundation board members are cotton growers who have a direct pecuniary interest in the eradication programs implemented by the Foundation.

Under the circumstances of this case, the fifth factor does not weigh in our consideration of whether the statute as a whole is an unconstitutional delegation of authority to the Foundation. The Foundation is vested with authority to impose monetary penalties for late payment of the assessments and to direct the Department to destroy a delinquent growers' crops, and it is further empowered to adopt rules, a violation of which is a criminal offense. *See* TEX. AGRIC. CODE §§ 74.120(c), 74.126(a). While this authority to impose penal sanctions strongly suggests an improper private delegation, principles of severability would allow us to strike down this power and still uphold the Act. Although the Act contains no express severability clause, the Texas Government Code provides that "[u]nless expressly provided otherwise, if any provision of a statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable." TEX. GOV'T CODE § 312.013(a). Here, the assessment and expenditure provisions of the Act could be implemented without the penalty provisions. Thus, even though the penalty provisions seem to represent an unconstitutional delegation of authority to the Foundation, this should not weigh in judging the validity of the Foundation's core function under the Act, *i.e.*, the levying and collecting of assessments and the expenditure of those assessments on eradication programs.

The sixth factor is inconclusive under the circumstances of this case. While the statute pertains to a specific, narrow purpose—eradication of the boll weevil and other cotton pests—it does not limit the program's cost and duration, other than to provide that the program is subject to the Sunset Act and that it should be discontinued once the boll weevil is eradicated. *See* TEX. AGRIC. CODE § 74.127.

The seventh factor, on its face, weighs against the delegation. While the Act is designed to allow those with firsthand experience in the cotton industry to lead the eradication effort, there is no assurance that those elected will actually have special qualifications or training regarding eradication of boll weevils, and there is absolutely no evidence that board actions were "taken for purposes which are independent of the statute," Professor Davis' salient test. DAVIS § 3.12, at 196 (2d ed.1978). The facts are thus quite distinct from a private delegation, say, for the promulgation of a municipal electrical code by an industry association consisting of electrical contractors, inspectors, and manufacturers. *See* Lawrence, *supra* at 689. There is, of course, some tension between this factor and the second factor. It would ordinarily be difficult for a private delegation both to guarantee adequate representation of those affected by the delegation and to vest decisionmaking authority in a group of experts. There is no evidence in the record of

---

**11.** The dissenting justices' conclusion that we have based our decision in part on the Commissioner's approval of an appointed board, 952 S.W.2d at 499 n .4, is thus erroneous.

a disinterested and yet eminent pre-existing entity to which the devising and implementing of a boll weevil eradication program could have been delegated. Thus, while the Act fails to meet the seventh factor, this failure is excused by the satisfaction of the second factor.

Finally, the eighth factor weighs against the delegation. The Legislature has provided very few statutory standards to guide the Foundation. While the Act provides the procedures for zone referenda and specifies the powers and duties of the board, it provides no guidance as to how assessments are to be set or the amount of debt that the Foundation may incur. Thus, in practice, the Foundation had free rein to incur over $9 million in debt in the Lower Rio Grande Valley Zone to be repaid by the growers there through several years of assessments, even though those growers voted within 21 months to discontinue their eradication program.

 We recognize that the judicial branch should defer to the judgment of the people's elected representatives whenever possible, and we by no means suggest that a private delegation must satisfy all eight of these factors. We recognize also that courts should, when possible, read delegations narrowly to uphold their validity. Thus, in *Edgewood,* we accepted the State's restricted reading of a statute giving the Commissioner of Education rulemaking authority, to hold that, as limited, no authority was conveyed in violation of the nondelegation doctrine. *See* 917 S.W.2d at 740–41. *See also Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). Here, however, the invalidity of the delegation does not hinge on any one provision of the Act that might be narrowly interpreted; rather, the Act as a whole represents an overly broad delegation of legislative authority to a private entity, violating a majority of the eight factors we have set forth.[12] Therefore, the Act cannot stand.

\* \* \* \* \* \*

The nondelegation doctrine should be used sparingly, when there is, in Justice Cardozo's memorable phrase, "delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 553, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring). Because we believe this is an extraordinary case, we affirm the judgments of the trial courts.

PHILLIPS, Chief Justice, delivered an opinion as to Part III, in which GONZALEZ, OWEN and BAKER, Justices, join.

GONZALEZ, Justice, filed an opinion concurring in part and dissenting in part, and concurring in the judgment, in which BAKER, Justice, joins and in Parts I, II, and III of which HECHT, Justice, joins.

HECHT, Justice, filed an opinion concurring in part and dissenting in part, and concurring in the judgment.

CORNYN, Justice, filed an opinion concurring in part and dissenting in part, and dissenting from the judgment, in which ENOCH, SPECTOR and ABBOTT, Justices, join.

GONZALEZ, Justice, joined by BAKER, Justice, and in Parts I, II, and III by HECHT, Justice, concurring in part and dissenting in part, and concurring in the judgment.

**Persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax.**

Tex. Const. art. VIII, § 1(c).

With the exception of Part II, I join the Court's opinion. The Court concludes that subchapter 74D of the Texas Agriculture Code (the Boll Weevil Eradication Foundation Act) does not violate the above-quoted provision by imposing an occupation tax on agricultural pursuits. The propriety of this conclusion depends on whether the assessments the Act authorizes are truly regulatory fees or are instead taxes. Rather than serving a clear regulatory purpose, the assessments fit this Court's definition of "taxes," which is "burdens or charges imposed by the legislative power of the State to raise

---

12. We thus disagree with the dissent's conclusion that we have not accorded the Act a presumption of constitutionality.

money for public purposes." *Friedman v. American Sur. Co. of New York,* 137 Tex. 149, 151 S.W.2d 570, 577 (1941); *see County of Harris v. Shepperd,* 156 Tex. 18, 291 S.W.2d 721, 723 (1956). Moreover, under this Court's decisions in *H. Rouw Co. v. Texas Citrus Commission,* 151 Tex. 182, 247 S.W.2d 231 (1952), and *Conlen Grain & Mercantile, Inc. v. Texas Grain Sorghum Producers Board,* 519 S.W.2d 620 (Tex.1975), the assessments are prohibited occupation taxes, not regulatory fees.

## I

If the Boll Weevil Eradication Foundation's assessments are an occupation tax on cotton growers, the assessments violate the Texas Constitution. *See* TEX. CONST. art. VIII, § 1(c). Having recognized the difficulty in distinguishing between regulatory measures and tax measures, however, we have articulated a more specific test:

> [W]hen, from a consideration of the statute as a whole, the primary purpose of the fees provided therein is the raising of revenue, then such fees are in fact occupation taxes.... On the other hand, if its primary purpose appears to be that of regulation, then the fees levied are ... not taxes.

*Rouw,* 247 S.W.2d at 234. Although the Court acknowledges and attempts to apply this standard, it nevertheless holds that the assessments imposed by the Foundation are not occupation taxes, but are regulatory fees designed to meet the costs of a program undertaken pursuant to the State's authority to protect the public health, safety, and welfare. 952 S.W.2d 463. I disagree.

The Court concludes that, because "eradication of the boll weevil is a proper subject for regulation by the State pursuant to its police power" and "the Foundation's assessments are levied in an amount needed to fund the eradication programs, and are used for that purpose," the assessments are regulatory fees. 952 S.W.2d at 462. Unquestionably, conducting a boll weevil eradication program is within the Legislature's police power, and Foundation assessments are spent almost entirely on eradication efforts. But expenditure of assessments for a police-power purpose does not necessarily render

the assessments a regulatory fee. The Court effectively holds that any charge assessed and spent for a proper police purpose is a fee, not a tax. This result is contrary to *Rouw* and *Conlen.* Guided by these decisions, one can reach no reasonable conclusion other than the assessments are prohibited occupation taxes on agricultural pursuits.

In *Rouw,* we considered whether assessments levied to fund the Texas Citrus Commission and its programs were a regulatory fee or an occupation tax. The Texas Citrus Commission was authorized to levy assessments upon all citrus fruit grown in Texas. The proceeds were then earmarked for

> education and research for the purpose of increasing knowledge with respect to Texas citrus fruits and by-products, and *protecting Texas citrus fruits from pests and diseases* and of finding new uses for Texas citrus fruits and by-products and of improving the quality and yield of such fruit and by-products.

*Rouw,* 247 S.W.2d at 232 (emphasis added). While we noted that the purposes of the statute were laudable, we held that the assessments were an occupation tax because the statute's primary purpose was not to regulate the citrus industry under the police power, but to raise revenue "in excess of the amount needed for regulation of the industry." *Id.* at 234.

Similarly, in *Conlen,* we considered whether assessments levied by the Texas Grain Sorghum Producers Board constituted an occupation tax. The Board was to expend the assessments for the purposes of "developing, carrying out, and participating in programs of research, *disease and insect control,* predator control, education, and promotion, designed to encourage the production, marketing, and use of the commodity." *Conlen,* 519 S.W.2d at 621–622 (emphasis added). Despite the fact that producers could obtain a refund of any assessment paid, we still held, relying on our decision in *Rouw,* that the assessments were occupation taxes. *Id.* at 623–24.

The stated purpose of the Boll Weevil Eradication Foundation Act is

to develop, carry out, and participate in programs of research such as *disease and insect control;* marketing to show low risk of pests in interstate and intrastate movement of cotton commodities; promotion of pest-free cotton commodities which increase market demand; and education of cotton raisers, cotton users, regulators, policymakers, and the general public on the effect of pests on cotton, its utility, its marketing, its yield, and its promotion. . . .

TEX. AGRIC. CODE § 74.101(a)(2) (emphasis added). *Rouw* and *Conlen* stand for the proposition that assessments made to increase the production and use of a particular crop, as is the case here, are not the type of "regulation" that legitimately supports a regulatory fee. If this purpose is a valid exercise of the police power, then *Rouw* and *Conlen* hold that assessments can be imposed and dedicated to a valid police-power purpose and still not be regulatory fees. Under the reasoning of these decisions, the issue in this case is not whether the Legislature's purpose was a valid exercise of its police power, but whether the assessment in furtherance of that purpose was a tax or a regulatory fee. Moreover, the assessments are to be made in an amount sufficient to "finance programs of marketing, promotion, research, and education calculated to increase the production and use of cotton." *Id.* § 74.113(a). No meaningful distinction exists between this statutory language and the statutory language describing the purposes of the assessments we held unconstitutional in *Rouw* and *Conlen.*

In both *Rouw* and *Conlen,* the statutes allowed expenditures for insect and pest control. This Court held, without examining the way the assessments were spent, that the assessments were occupation taxes. It was not necessary for us to review the allocation of the expenditures because all the proposed uses, including any expenditures for insect and pest control, were designed to increase production and use of the respective crops. Expenditures to increase production and crop use are simply not the type of "regulation" that legitimately supports a regulatory fee. By holding otherwise, without an adequate or convincing explanation, the Court errs.

Furthermore, in its analysis, the Court overlooks a critical distinction between a regulatory fee and an occupation tax. A regulatory fee also must bear a reasonable relationship to the statute's legitimate regulatory object. *City of Fort Worth v. Gulf Ref. Co.,* 125 Tex. 512, 83 S.W.2d 610, 618 (1935); *see City of Houston v. Harris County Outdoor Adver. Ass'n,* 879 S.W.2d 322, 326–327 (Tex. App.—Houston [14th Dist.] 1994, writ denied), *cert. denied,* —— U.S. ——, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995). Although one of the stated purposes of the legislation is statewide boll weevil eradication, in my view, the assessments are not reasonably related to this purpose.

The assessments are not regulatory fees in any true sense because they are not mandatory. Passage of zone-specific referenda, not boll weevil infestation, triggers the assessments and eradication programs. The Foundation has held referenda in only five of the nine zones originally proposed, and eradication or suppression programs are currently active in only three zones. Of the 254 counties in Texas, only about 86 have participated, are now participating, or are presently scheduled to participate in an eradication or suppression program. In the remaining 168 counties, cotton growers are not subject to any of the Act's provisions, including assessments, and are not required to participate in the program, regardless of the presence of boll weevils or the extent of any infestation. Statewide boll weevil eradication simply cannot be accomplished unless all areas of infestation are included in the program. The fact that the occurrence of eradication efforts hinges upon a vote by cotton growers, rather than on a finding of boll weevil infestation, belies the argument that this Act is regulatory in nature.

A truly regulatory measure designed to eradicate the boll weevil would operate in all areas of the State infested with boll weevils. The Legislature proclaimed the boll weevil to be a statewide nuisance that presents an economic threat to the cotton industry of the entire State. TEX. AGRIC. CODE §§ 74.001, 74.101(a). Although the Legislature also proclaimed eradication of the boll weevil to

be a public necessity, *id.* § 74.001, it derailed the declared objective by delegating to local growers the right to determine, on bases wholly unrelated to the need for eradication, whether they would participate in the program. The decision to permit growers to opt for or against eradication bears no rational relationship to the Act's regulatory purpose, and in fact contradicts that purpose. By delegating this "necessary" police-power measure and making participation in the program contingent on voter approval, the Legislature effectively nullified the Act's stated objective.

The burden of regulation under the Act falls on many cotton growers whose crops are not infested and does not fall on many cotton growers whose crops are infested. Once the assessment is approved by referendum, growers who fail to timely file acreage reports and pay their assessments are subject to a wide array of penalty and collection measures. *See* TEX. AGRIC. CODE § 74.115. These measures include not just monetary sanctions, but in fact allow the Agriculture Commission to file liens on cotton crops and to plow up and destroy cotton crops based on Foundation recommendations. *See id.* Cotton that has been planted in an established eradication zone and for which assessments have not been paid is labeled a public nuisance subject to the Act's penalties, even in the total absence of boll weevil infestation. *See id.* On the other hand, a grower with cotton that is infested with boll weevils, but located in an area in which no referendum has passed, is not required to participate in an eradication program and is not subject to any of the Act's enforcement mechanisms. Perhaps in response to this inequitable burden, cotton growers in established zones have petitioned for referenda to cancel the Foundation's eradication programs. Growers in the Lower Rio Grande Valley Eradication Zone, for example, succeeded in their efforts to cancel their eradication program after the Foundation's efforts led to a disastrous crop in that zone in 1995. The Act is unconstitutional, however, not because it has failed to achieve its stated purpose, but because it does not "regulate" in any meaningful sense.

For these reasons, I conclude that the Act does not have a regulatory purpose. I therefore would hold that the assessments violate article VIII, section 1(c) of the Texas Constitution.

## II

I also do not agree, as urged by an amicus curiae, that the assessments are validated by article XVI, section 68 of the Texas Constitution. Article XVI, section 68 provides:

The legislature may provide for the advancement of food and fiber in this state by providing representative associations of agricultural producers with authority to collect such **refundable** assessments **on their product sales** as may be approved by referenda of producers. All revenue collected shall be used solely to finance programs of marketing, promotion, research, and education relating to that commodity.

TEX. CONST. art. XVI, § 68 (emphasis added). Under *Conlen*, assessments used to finance marketing, promotion, research, and education programs are occupation taxes. The purpose of article XVI, section 68 is to create an exception to the constitutional prohibition against occupation taxes on agricultural pursuits when refundable assessments on product sales are used to finance marketing, promotion, research, and education programs.

However, under the clear language of this provision, such assessments are valid only if they are refundable and are based on product sales. The Foundation's assessments are neither. In fact, the Foundation has admitted that a grower cannot obtain a refund of the assessments he has paid. While any funds remaining after the Foundation has been dissolved will be returned to the growers on a pro rata basis, this does not make the assessments refundable. The grower cannot receive a refund on his pro rata share of the assessments that the Foundation expended, and there is no guarantee that the Foundation will have remaining funds upon dissolution. In fact, at the present time, the Foundation is several million dollars in debt. Furthermore, the assessments are not based on product sales, but are based on the acreage planted by the grower. Accordingly,

article XVI, section 68 does not validate the assessments under the Act.

### III

I concur in the Court's judgment. However, for the above-stated reasons, I would hold that the assessments levied by the Foundation are unconstitutional occupation taxes on agricultural pursuits.

HECHT, Justice, concurring in part and dissenting in part, and concurring in the judgment.

The Texas Boll Weevil Eradication Foundation wields more legislative power with less restraint than any other privately chartered nonprofit corporation in Texas, or, as far as I can tell, in the history of Texas. Twelve other states have private foundations to help eradicate boll weevils; none has—or appears to need—the power the Legislature has ceded the Texas Boll Weevil Eradication Foundation. The Foundation is by no means a typical administrative agency; it is not even an atypical administrative agency; it is a complete anomaly in the structure of government.

Thus, I agree with the Court that the Official Cotton Growers' Boll Weevil Eradication Foundation Act, TEX. AGRIC. CODE §§ 74.101–.127, delegates legislative power to the Foundation in violation of Article II, Section 1 of the Texas Constitution, but I think this conclusion is much clearer than the Court does. The Court's decision certainly does not "threaten the heretofore established role of quasi-governmental entities under Texas law", as the sky-is-falling rhetoric of JUSTICE CORNYN's opinion forebodes. *Post* at 491. Holding the extraordinary delegation of power to the Foundation unconstitutional is no more a threat to other administrative agencies than it is to the ozone layer.

The vice in the delegation to the Foundation does not lie simply in the fact that the Foundation is a private entity or that, as I conclude, it is privately managed. Nor is the vice simply that the only standards prescribed by the Legislature to guide the Foundation are extremely broad, or that the Foundation is largely free of public supervision. The Court's decision rests on a consid-

eration of all these factors. Plainly put, the Texas Boll Weevil Eradication Foundation is little more than a posse: volunteers and private entities neither elected nor appointed, privately organized and supported by the majority of some small group, backed by law but without guidelines or supervision, wielding great power over people's lives and property but answering virtually to no one. The Foundation is only a private, nonprofit corporation, run mostly by individuals who have never been elected or appointed by an elected official, but the Legislature has empowered it to conduct elections of cotton growers in various areas throughout the State, to determine whether and how to conduct a boll weevil eradication program, to assess cotton farmers millions of dollars to pay for the program, to deposit those assessments in its own account not subject to state purchasing and auditing requirements, to enter private property and destroy healthy crops for failure to pay assessments, to borrow unlimited amounts and commit cotton farmers to repay its debts without their approval, and to spend the money without any state supervision. The Legislature has broad discretion to delegate authority to administrators, but for reasons the Court explains, this goes too far.

I also think that the Act denies procedural due process by authorizing the Foundation to enforce assessments to the point of destroying crops with no opportunity for protest or hearing before enforcement and no realistic right to recover wrongful charges afterward. Although the Court does not reach this issue, it is troubled by it. *Ante* at 464.

Finally, for the reasons given in JUSTICE GONZALEZ's opinion, I agree that assessments under the Act are an occupation tax on cotton growers in violation of Article VIII, Section 1(c) of the Texas Constitution.

For all these reasons, I join in the Court's judgment holding the Act unconstitutional.

### I

The Court's reading of the Act makes the delegation issue closer than it should be. If one reads the Act as everyone involved in implementing it has—Texas Cotton Producers, Inc., the Foundation board of directors,

the Commissioner of Agriculture, the Department of Agriculture and its general counsel, and arguably the Legislature—the unconstitutional delegation of power is clear. As far as I can determine, the Legislature has never made a similar delegation of authority, and it was not necessary to do so in this situation.

## A

The Act was passed by the Legislature on February 25, 1993, was signed by the Governor on March 10, 1993, became effective June 1, 1993, and was amended in 1995. Act of February 25, 1993, 73rd Leg., R.S., ch. 8, 1993 Tex. Gen. Laws 29, as amended by Act of May 3, 74th Leg., R.S., ch. 227, 1995 Tex. Gen. Laws 1976, and codified at TEX. AGRIC. CODE §§ 74.101–.127. The Act declared that "the boll weevil entered Texas from Mexico in 1892 and presents a major economic threat to Texas' cotton crop", TEX. AGRIC. CODE § 74.101(a)(1), that "there exists a need to develop, carry out, and participate in programs of research such as disease and insect control", id. § 74.101(a)(2), and that "it is the intent of the legislature that the program be carried out with the best available integrated pest management techniques", id. § 74.101(a)(3), which are defined as "the coordinated use of pest and environmental information with available pest control methods to prevent unacceptable levels of pest damage by the most economical means and with the least possible hazard to people, property, and the environment", id. § 74.102(12).

The Act called for "[t]he creation and use of a boll weevil eradication foundation as a vehicle to provide for assessments and governing boards and to establish eradication zones in order to suppress and eradicate boll weevils". Id. § 74.101(c). Specifically, the Act provides:

(a) A nonprofit organization authorized under the laws of this state that represents cotton growers may petition the commissioner [of agriculture] for certification as the organization authorized to:

(1) create a foundation;

(2) conduct the initial election of the board; and

(3) conduct referenda to establish eradication zones.

(b) A petition under this section must include:

(1) a geographic description of each proposed eradication zone, including a separate proposed eradication zone for the High Plains Boll Weevil Suppression Program Area and the St. Lawrence Cotton Growers Boll Weevil Control Zone;

(2) an initial plan for representation for each proposed eradication zone on a board consisting of 6, 9, 12, or 15 members; and

(3) any other information required by the commissioner.

(c) Not later than the 60th day after the date on which the commissioner receives a petition for certification, the commissioner shall hold a public hearing to consider the pending petition.

(d) After a hearing is held under Subsection (c) of this section the commissioner may select one organization to implement this subchapter and shall certify that the selected organization:

(1) has submitted a petition that complies with this subchapter;

(2) can adequately represent the interests of cotton growers in the proposed eradication zones described by the organization's petition; and

(3) is authorized to conduct eradication zone referenda and initial board elections under Sections 74.105 and 74.106 of this code.

Id. § 74.103. The Act requires the Commissioner to certify the selected organization "as the organization authorized to create an official boll weevil eradication foundation." Id. § 74.104(a).

The Act does not specify what type of entity the foundation is to be. On May 14, 1993, while the Legislature that passed the Act was still in session and before the Act became effective, Texas Cotton Producers, Inc., a Texas nonprofit corporation whose primary purpose is "to allow a forum for discussion of problems and activities of mutu-

al interest to the Texas Cotton Industry", petitioned the Commissioner for certification to create the foundation. Texas Cotton Producers proposed to create the Texas Boll Weevil Eradication Foundation, Inc., a Texas nonprofit corporation. On July 7, 1993, the Commissioner certified Texas Cotton Producers to create the foundation. The Commissioner must therefore have believed that creating the foundation as a nonprofit corporation would comply with the Act. The Foundation's articles of incorporation were filed September 14, 1993. In 1995 the Legislature amended the Act to authorize the Foundation's board of directors to "take other action and exercise other authority as necessary to execute any act authorized by this subchapter or the Texas Non–Profit Corporation Act". *Id.* § 74.108(a)(7). The Legislature knew, of course, that the Foundation was a nonprofit corporation, and by specifically giving the Foundation board authority under the Texas Non–Profit Corporation Act, it appears to have approved of the entity. Thus, it seems reasonably clear that the Legislature intended that the foundation be a nonprofit corporation.

Unless a nonprofit corporation is to be governed by its members (if it has members), it must be governed by a board of directors, and the initial directors must be named in its articles of incorporation. TEX.REV.CIV. STAT. ANN. arts. 1396–2.08 (members), 1396–2.14 (directors), 1396–3.02 (articles). The Court reads the Act to contemplate that the foundation must "at all times" be governed by a board of directors, each of whom has been elected. *Ante* at 474. But the Act nowhere states that all directors of the foundation must be elected. To the contrary, the Act strongly suggests that the foundation may be governed by non-elected directors. Section 74.103(b)(2), quoted above, requires that an organization petitioning the Commissioner for certification to create the foundation must present "an initial plan for representation for each *proposed* eradication zone on a board consisting of 6, 9, 12, or 15 members" (emphasis added). Proposed zones cannot have elected board members because a board election must "be held concurrently with an eradication zone referendum", TEX. AGRIC.

CODE § 74.106(a), and "[i]f a referendum to establish an eradication zone fails, the concurrent election of board members from the proposed eradication zone ... has no effect", *id.* § 74.105(d). Thus, only established zones can have elected board members. A plan for representing proposed zones on the Foundation board must necessarily call for non-elected directors.

It is not even clear that every *established* zone must be represented by an elected board member. The Act says only that "[e]ach zone shall be represented on the board." *Id.* § 74.106(a). The Act requires the zone referendum ballot to state "whether a board member is elected by a plurality or a majority of the votes cast". *Id.* § 74.114(c)(2). (The Commissioner has determined that board members are elected by a plurality of the votes cast. 4 TEX. ADMIN. CODE § 3.6(c).) If a zone is established by referendum but no one is elected by a plurality or majority, the Act is silent on how the zone's board representative is to be chosen. (The Commissioner has not promulgated a rule to cover such a situation, and the Foundation has promulgated no rules at all.)

The Court's conclusion that the Foundation must "at all times" be governed by elected board members appears to be based on several references to "initial elections". Section 74.103(a)(2) states that an organization representing cotton growers can petition the Commissioner to create a foundation and "conduct the *initial election* of the board" (emphasis added). Section 74.103(d)(3) states that the Commissioner must certify the organization selected to create the foundation as being "authorized to conduct eradication zone referenda and *initial board elections*" (emphasis added). Section 74.104(a) states that the organization selected by the Commissioner to create the foundation "may conduct the *initial* eradication zone referenda and *board elections*" (emphasis added). Section 74.106(a) states that "[t]he *initial election* for board members from a proposed eradication zone shall be held concurrently with an eradication zone referendum" (emphasis added). The Act never refers to the initial *board* or the initial *directors*, but only to initial *elections*. The Court appears to

infer from references to initial elections that the initial directors must all be elected, but the inference is not compelled by logic and is contrary to the express language in the statute that the petitioning organization present a plan for representation of *proposed* eradication zones.

Moreover, the Court's reading of the Act is contrary to the Commissioner's rules. The Act states that "[t]he commissioner shall adopt rules for voting in the initial board election and initial referenda to establish eradication zones." TEX. AGRIC. CODE § 74.114(c). The Commissioner's rule 3.3(c) states that "[t]he foundation may conduct an assessment referendum or referenda either in conjunction with the initial board elections and eradication zone referendum or referenda or at a time subsequent to the initial elections and referendum or referenda." 4 TEX. ADMIN. CODE § 3.3(c). In an assessment referendum, the foundation must propose the "maximum assessment to be paid by cotton growers having production in the eradication zone" and the "time for which the assessment will be made." TEX. AGRIC. CODE § 74.113(b). To make this proposal, the foundation must first, of course, "determine the assessment needed in each eradication zone" to accomplish its goals. *Id.* § 74.113(a). If an assessment referendum may be held concurrently with the zone referendum and board election in the same zone, as rule 3.3(c) expressly permits, then the assessment needed for the zone must be determined by a foundation board on which the proposed zone has no elected member. Also, the first assessment referendum in any zone could be conducted by a board on which there were no elected members, there having yet been no zone referendum. The procedure established by the Commissioner's rules thus contemplates a foundation board with some or even all non-elected members. The Court cites rule 3.3 but makes no effort to reconcile the rule with its own reading of the Act.

The Court's reading of the Act is also contrary to that of every other person or entity involved with its implementation. Texas Cotton Producers was active in writing and passing the Act. It was the only organization to petition the Commissioner for certi-

fication to create a foundation. Its petition proposed nine eradication zones. Two were zones required by the Act: the High Plains Boll Weevil Suppression Program Area, consisting of 25 counties between Amarillo and Midland specified by statute, plus three additional counties, and the St. Lawrence Cotton Growers Boll Weevil Control Zone, consisting of four counties south and east of Midland, also specified by statute. *Id.* §§ 74.102(9), (14), 74.103(b)(1), 74.107(a), 74.108(d). The other seven zones were: Rolling Plains North, 12 counties near the southeast corner of Oklahoma; Rolling Plains Central, 15 counties between Abilene and Wichita Falls; Rolling Plains South, nine counties around San Angelo; Central Texas River Bottoms, Blacklands, and Red River, 39 counties from south of Austin to Texarkana; Winter Garden, Coastal Bend and Upper Gulf Coast, 26 counties from San Antonio and Victoria to south of Corpus Christi; Lower Rio Grande Valley, the eight most southern counties in the State; and Trans–Pecos and El Paso, 13 counties from El Paso to just east of the Pecos River. Parts of three counties were included in two zones. In all, Texas Cotton Producers proposed that 151 of Texas' 254 counties be divided into nine eradication zones, and that each zone be represented on the foundation's board by one director. The proposed zones did not include all counties in which cotton is grown.

Texas Cotton Growers' petition, presented to the Commissioner while the Legislature that passed the Act was still in session, proposed that "[o]n creation of the proposed official cotton growers' boll weevil eradication foundation by TCP the initial board will be appointed by the board of TCP pending conduct of the board election." The petition called for the nine proposed zones to be represented by one director each. Thus, Texas Cotton Growers' understanding of the Act was that it required representation from proposed as well as established zones, and that it permitted non-elected members on the board. The Commissioner's certification of Texas Cotton Growers to create the foundation as proposed in the petition indicates that he agreed with Texas Cotton Growers' view of the implementation of the Act and operation of the foundation.

As proposed, Texas Cotton Growers named nine initial directors of the Foundation—one for each proposed eradication zone—in the articles of incorporation:

| | |
|---|---|
| High Plains | Wayne Huffaker |
| St. Lawrence | Clifford Hoelscher |
| Rolling Plains North | Robert Belew |
| Rolling Plains Central | Woody Anderson |
| Rolling Plains South | Kenneth Gully |
| Central Texas | Dan Pustejovsky |
| Winter Garden | Craig Shook |
| Lower Rio Grande Valley | Chris Allen |
| Trans–Pecos | Jim Ed Miller |

At the time Foundation was created, none of the proposed eradication zones had been approved by a referendum of local cotton growers, and none of the board members had been elected. Nevertheless, the Foundation board immediately began to alter the area in various zones with approval of the Commissioner, plan referenda, set assessments, and devise eradication programs. This demonstrates not only Texas Cotton Producers' and the Commissioner's approval of the nonelected Foundation board, but the board's reading of its own authority under the Act.

The Foundation operated for more than five months before the first zone was established by referendum and the first board member elected. During this time the board members appointed by Texas Cotton Producers met to conduct the Foundation's business and plan for the first referendum. Legal counsel from the Department of Agriculture met with the board to advise them concerning its legal responsibilities. Counsel never raised a concern about the non-elected members on the board, thus indicating counsel's approval of the constitution of the board.

On February 28, 1994, cotton growers in the proposed Southern Rolling Plains zone approved participation in the program and an assessment, and elected Kenneth Gully as a Foundation board member. Thus, the first assessment referendum was proposed by a board on which there was no elected member and was conducted concurrently with the first zone referendum and board election. This is consistent with the Commissioner's rule 3.3(c) but inconsistent with the Court's reading of the Act. Two months later, on April 30, cotton growers in the Lower Rio Grande Valley zone approved participation in the program and elected Chris Allen to the Foundation board, but did not approve an assessment. Not until a second referendum on October 15, 1994, did Lower Rio Grande Valley cotton growers approve an assessment for their zone. On December 1, 1994, Central Rolling zone cotton growers approved their zone and assessment and elected Woody Anderson as their board member. Cotton growers in the Winter Garden and High Plains zones followed suit on February 16, 1995, and April 15, 1995, respectively, and elected Craig Shook and Wayne Huffaker, respectively, to the Foundation board. The last zone approved was St. Lawrence, on August 22, 1995, and Clifford Hoelscher was elected to the board. Three board members, Chris Allen, Dan Pustejovsky, and Jim Ed Miller, were replaced by John Boling, Wilburn Beckhusen, and Bob Bickley, respectively. The record does not reflect how the replacements were chosen, but it does not appear that they were elected from their zones.

When the 74th Legislature convened in January 1995, a majority of the Foundation's board were still members appointed by Texas Cotton Growers and not elected. When the session ended, four members of the board still had not been elected. The Legislature amended the Act in a number of respects. Act of May 3, 1995, 74th Leg., R.S., ch. 227, 1995 Tex. Gen. Laws 1976. Among other things, the Legislature: revised the definition of "cotton grower", *see id.* § 74.102(5); authorized the foundation board to accept gifts and grants, borrow money, and execute any act allowed by the Texas Non–Profit Corporation Act, *see id.* 74.108(a)(5)-(7); authorized the board to add to the area in an eradication zone under certain circumstances, *see id.* § 74.108(b); authorized the board to add to the High Plains zone, *see id.* § 74.102(9), but not to

reduce it, *see id.* § 74.108(d), and to change the St. Lawrence zone, *see id.* § 74.102(14); gave the foundation governmental immunity, *see id.* § 74.109(f), and added the foundation and its directors to those exempted from liability for all acts except gross negligence, criminal conduct, and dishonesty, *see id.* § 74.110(a); specified that assessments could be used to pay the foundation's debts, *see id.* § 74.113(f)(2); and added that "[i]f the foundation is abolished or the program discontinued for any reason, assessments approved, levied, or otherwise collectible on the date of abolishment remain valid as necessary to pay the financial obligations of the foundation", *see id.* § 74.127(c).

The point is, the Legislature made significant, substantive changes in the Act. By failing to amend the Act to require that foundation board members all be elected, the Legislature ought to be presumed to have acquiesced in the Commissioner's, Department's, and Foundation's unanimous and consistent construction of the Act, adopted contemporaneously with the passage of the statute by everyone urging its enactment, allowing the board to function without elected board members. *See Direlco, Inc. v. Bullock,* 711 S.W.2d 360, 363–364 (Tex. App.—Austin 1986, writ ref'd n.r.e.), cited with approval in *Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169, 170 n. 4 (Tex.1989); *see also Reed v. State Dept. of Licensing & Regulation,* 820 S.W.2d 1, 4 (Tex.App.—Austin 1991, no writ). In any event, the Legislature must be presumed to have been aware of the manner in which the Foundation was actually operating and to have determined, in amending the statute in other respects, that no amendment was necessary to change the composition of the Foundation board. *See Central Power & Light Co. v. Sharp,* 919 S.W.2d 485, 488–489 (Tex.App.—Austin 1996), *writ denied,* —— S.W.2d —— (Tex.1997) (per curiam) (disapproving another part of the court of appeals' opinion); *Massachusetts Indem. & Life Ins. Co. v. Texas State Bd. of Ins.,* 685 S.W.2d 104, 109 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *see also Texas Workers' Compensation Comm'n v. City of Bridge City,* 900 S.W.2d 411, 416 (Tex.App.—Austin 1995, no writ); *cf. Western Co. v. Sheppard,* 181 S.W.2d 850, 856 (Tex.Civ.App.—Austin 1944, writ ref'd) ("It must be presumed that the Legislature, when it passed the act, was familiar with the manner in which such business [the subject of the act] was conducted.")

It is possible, of course, that the Court is correct and the Commissioner, Department, and Foundation, and at least apparently the Legislature, are all wrong about whether non-elected members can serve on the Foundation board. But when the Court's construction of the Act also contradicts strong suggestions in the Act itself and all operations under the Act since its inception, the Court's position is virtually untenable. While it is possible to read the Act to require only elected board members, that construction is less reasonable or plausible than the opposite one.

**B**

I join in the Court's opinion concerning delegation because even under its construction of the Act, I agree that the delegation of power to the Foundation is unconstitutional. If the Act allows the Foundation to operate with a non-elected board, the delegation of power to the Foundation is even less defensible than the Court believes. The Court details the respective powers of the Foundation, the Commissioner, and the Department. Without any supervision by an elected official or governmental agency, the Foundation can wield enormous power. For example, while the Foundation must "conduct a referendum in each proposed eradication zone to determine whether cotton growers desire to establish an official boll weevil or pink bollworm eradication zone", TEX. AGRIC. CODE § 74.105(a), the statute imposes no deadlines on this duty. In the more than four years the Foundation has been in existence, it has conducted zone referenda in only six of the proposed zones. The Foundation thus has the unilateral right to determine whether, over a course of years, at least, to poll cotton growers to determine whether a zone should exist. The Foundation also has the unilateral right to determine the maximum assessment to be put to a referendum. The voters

cannot raise or lower this amount; they can only vote for or against it.

While assessments must "be used solely to finance programs approved by the commissioner as consistent with" the Act and the Constitution, *id.* § 74.109(h), the Foundation has great leeway in determining the details of those programs. The nature of the programs and the manner in which they are conducted can profoundly affect cotton growers, as the experience in the Lower Rio Grande Valley zone, which I describe below, indicates. Moreover, the Foundation has the absolute right to determine how much of the cost of a program to borrow and how much to pay for with collected revenue. The Foundation can borrow and spend the maximum total assessment in the first few months of the program and obligate cotton growers to repay the debt over the total period approved in the referendum. If the program appears to be unsuccessful, growers have no effective means of stopping it before the total assessment has been committed.

The Foundation's powers to enforce collection of assessments are truly draconian. The Foundation may enter private property essentially at will and without the owner's permission at any time during daylight hours. *Id.* § 74.117. It may set penalties for late payments. *Id.* § 74.115(a). The Court observes that growers are entitled to protest imposition of such penalties to the Department, *ante* at 499, but as a very technical matter, the Court is in error. The Commissioner's rule 3.57(a) states that "[a] person against whom *the department* has assessed a penalty . . . may protest such action with the commissioner". 4 TEX. ADMIN. CODE § 3.57(a). But the Act expressly authorizes the *board,* not the *Department,* to set penalties. TEX. AGRIC. CODE § 74.115(a). Furthermore, the Act *requires* the Department—it has no discretion—to destroy crops on the Foundation's recommendation, even if they are not infested with boll weevils. *Id.* § 74.115(b). The assertion in JUSTICE CORNYN's opinion that "the statute itself . . . and not the Board . . . determines the circumstances under which a grower's crop may be destroyed for nonpayment of assessments" is, I believe, very misleading. *Post* at 498.

The Act "determines" only one circumstance: "on recommendation of the foundation". *Id.* The only limit the Act places on the Foundation's power to destroy crops is that it cannot do so if it does not feel it should. Otherwise, the Foundation has complete discretion.

Since the Foundation's creation, these powers have resided in non-elected directors. For 19 months the Foundation was governed by a board a majority of which had not been elected but rather, had been designated by Texas Cotton Producers, Inc. During this period the Foundation arranged a $62 million line of credit; it has actually borrowed over $25 million. Many of the eradication programs were implemented by the non-elected board. For example, the Southern Rolling Plains zone's eradication program was devised and its assessment set by a board on which no member had been elected, and the program was carried out by a board controlled by eight non-elected members from proposed zones. As of February 1996, the zone had borrowed over $7.5 million and spent over $11.5 million.

The non-elected board also implemented the eradication program in the Lower River Grande Valley zone in 1995. The approved assessment raised about $2.5 million the first year to pay for the program, but the Foundation borrowed and spent $11.5 million, secured by all assessments the Foundation could collect from the zone, leaving a $9 million deficit to be repaid from assessments collected over the next seven years. (The referendum approved assessments up to eight years.) Instead of the expected 420,000-bale harvest that year, cotton growers produced only about 50,000 bales, for an estimated loss to growers of $150 million. Steven H. Lee, *Opening a Can of Worms,* DALLAS MORNING NEWS, Jan. 11, 1996, at 1D. Growers blamed the eradication program for using pesticides that destroyed not only the boll weevil but also insects that prey on the beet armyworm, thereby allowing a devastating armyworm invasion. *Id.* Cotton growers immediately petitioned for a referendum to leave the eradication program. The referendum passed January 31, 1996. The board made the zone's member, John Boling, ex officio without voting privileges or access to

Foundation information, even though non-elected members from nonapproved zones continued to serve as full members. The 1996 cotton crop in the Rio Grande Valley zone, on less land with less rain, was more than twice the prior crop. *In Tall Cotton*, DALLAS MORNING NEWS, Aug. 27, 1996, at 16D. Despite their withdrawal from the program, cotton growers in the zone must continue to pay assessments up to seven more years to discharge the Foundation's debt incurred for that zone.

The potential power delegated to the Foundation and its actual exercise both demonstrate the unconstitutionality of the Act. The foundation authorized by the Act is little more than a posse. The Foundation and its agents are immune from liability for all their acts except gross negligence, criminal conduct, and dishonesty, *id.* § 74.110(a), and the Foundation has sovereign immunity, *id.* § 74.109(f). Applying the Court's test to this construction of the Act, as opposed to the Court's much more deferential reading, the result is even clearer.

## C

No other private agency in Texas possesses such unrestricted power. The only entity remotely similar is the Texas Automobile Insurance Plan Association, created by Article 21.81 of the Texas Insurance Code. TAIPA is a nonprofit corporation whose members are all authorized automobile insurers. TEX. INS.CODE art. 21.81, § 2(a). Its 15-member governing body consists of eight members elected by the member insurers, five public members nominated by the Office of Public Insurance Counsel and selected by the Commissioner of Insurance, and two local recording agents. *Id.* § 2(b). TAIPA, like the Texas Boll Weevil Eradication Foundation, is thus a private entity with a largely private governing body. Unlike the Foundation, however, TAIPA's authority is very limited. It can only propose a plan for assigned risk insurance to the Commissioner for his approval, *id.* § 3(c), and administer it, *id.* § 3(a). The statute imposes certain requirements on the plan, *id.* § 3(b), (d)–(f). The Commissioner retains the power to set rates under the plan. *Id.* § 5. Given the detailed

statutory requirements and the supervisory role of the Commissioner, TAIPA is little more than an adviser to and implementer for the Commissioner.

JUSTICE CORNYN's opinion suggests that the delegation of power to the Texas Boll Weevil Eradication Foundation is no different from statutes that condition licensing on graduation from accredited schools. *Post* at 494. The argument is that such statutes give accrediting associations power over licensing. But any power accrediting associations have is directed at the schools, not at licensing in Texas, and derives from association members, not from the Texas Legislature. The limited operation of such associations simply cannot be compared with the Foundation's broad powers.

I am not aware of any entity in Texas' history remotely resembling the Texas Boll Weevil Eradication Foundation. The need for an unprecedented delegation of power to the Foundation is not apparent. Twelve other states have boll weevil eradication laws. ALA. CONST. amend. 449; ALA.CODE §§ 2–19–120 to 2–19–135 (Supp.1996); ARK.CODE ANN. §§ 2–16–601 to 2–16–617 (Michie 1996); FLA. STAT. ANN. §§ 593.101–.117 (West Supp.1997); GA.CODE ANN. §§ 2–7–150 to 2–7–158 (1990 & Supp.1996); LA.REV.STAT. ANN. §§ 1601–1617 (West Supp.1997); MISS.CODE ANN. §§ 69–37–1 to 69–37–37 (Supp.1996); MO. ANN. STAT. §§ 263.500–.537 (Supp.1997); N.M. STAT. ANN. §§ 76–6A–1 to 76–6A–16 (Michie Supp. 1996); N.C. GEN.STAT. §§ 106–65.67 to 106–65.91 (1996); OKLA. STAT. ANN. tit. 2, §§ 3–50.1 to 3–50.20 (West Supp.1997); S.C.CODE ANN. §§ 46–10–10 to 46–10–130 (Law Co-op.1987 & Supp.1996); TENN.CODE ANN. §§ 43–6–401 to 43–6–431 (1993 & Supp.1996). North Carolina was the first to pass a statute, in 1975, and South Carolina passed its statute the following year. Alabama, Georgia, Florida, and Tennessee passed their statutes in 1984, 1985, 1987, and 1989, respectively. Arkansas and Louisiana passed their statutes in 1991 and 1992, respectively. Texas passed its statute in 1993, along with two other states, Mississippi and Oklahoma. Missouri passed its statute in 1995. New Mexico was the last state to pass a statute, in 1996. Thus, Texas had eight other statutory

schemes to guide in adopting its own, and two states have had the benefit of Texas' experience.

Each of the other twelve states except Louisiana employs a private organization representing cotton growers to assist with coordinating programs and funds. ALA.CODE § 2–19–130; ARK.CODE ANN. § 2–16–612; FLA. STAT. ANN. §§ 593.111–.112; GA.CODE ANN. § 2–7–155; MISS.CODE ANN. § 69–37–13; MO. ANN. STAT. § 263.523; N.M. STAT. ANN. § 76–6A–5, –3C; N.C. GEN.STAT. § 106–65.86; OKLA. STAT. ANN. tit. 2, § 3–50.5; S.C.CODE ANN. § 46–10–85; TENN.CODE ANN. § 43–6–421. In every state but Oklahoma, the organization's role is merely advisory to a public agency or official; the responsibility for all significant decisions rests directly upon the public agency or official. Even Oklahoma's Boll Weevil Eradication Organization is not as private and does not have the power of the Texas Boll Weevil Eradication Foundation. Among other things, the board of the Oklahoma Organization is always either appointed by the governor or elected by growers, OKLA. STAT. ANN. tit. 2, §§ 3–50.5, 3–50.7; only the state department of agriculture has the power to set and collect late charges, *id.* § 3–50.11(A); and only the department has the power to destroy crops for noncompliance with the statute, *id.* § 3–50.18. The Organization's authority is limited in other respects as well.

The Texas statute does not appear to be patterned closely on any other state statute, and no other state's statute is patterned on Texas'. No other state has determined that a viable boll weevil eradication program depends upon so expansive a delegation of power to a private entity as Texas gives its Boll Weevil Foundation. The Foundation is thus uniquely situated, both in Texas government, and among similar organizations in other states.

### D

Because I conclude that the Texas Boll Weevil Eradication Foundation is as the Legislature intended, a private nonprofit corporation privately managed, and that the Foundation has been delegated broad, unrestricted legislative power, I agree with the Court that the Act violates Article II, Section 1 of the Texas Constitution. I also agree with the Court's explanation why the use of referenda does not save the Act, but I offer a few additional reasons.

In *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), the United State Supreme Court considered various challenges to the Bithuminous Coal Conservation Act passed by Congress in 1935, which contained the following provision:

> Whenever the maximum daily and weekly hours of labor are agreed upon in any contract or contracts negotiated between the producers of more than two-thirds the annual national tonnage production for the preceding calendar year and the representatives of more than one-half the mine workers employed, such maximum hours of labor shall be accepted by all the code members.

*Carter*, 298 U.S. at 283–284, 56 S.Ct. at 860. The effect of the statute, as the Court explained, was "to subject the dissentient minority, either of producers or miners or both, to the will of the stated majority". *Id.* at 310–311, 56 S.Ct. at 872. The Court had little difficulty invalidating the provision:

> The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. The record shows that the conditions of competition differ among the various localities. In some, coal dealers compete among themselves. In other localities, they also compete with the mechanical production of electrical energy and of natural gas. Some coal producers favor the code; others oppose it; and the record clearly indicates that this diversity of view arises from their conflicting and even antagonistic interests. The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental func-

tion, since, in the very nature of things, one person may not be intrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. *A L A Schechter Poultry Corp. v. United States,* 295 U.S. 495, at page 537, 55 S.Ct. 837, at page 846, 79 L.Ed. 1570, 97 A.L.R. 947; *Eubank v. Richmond,* 226 U.S. 137, 143, 33 S.Ct. 76, 77, 57 L.Ed. 156, 42 L.R.A.(N.S.) 1123; *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 121, 122, 49 S.Ct. 50, 51–52, 52, 73 L.Ed. 210, 86 A.L.R. 654.

*Id.* at 311, 56 S.Ct. at 873.

The Court has used a similar analysis to strike down other legislation. In *Eubank v. City of Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Court invalidated a city ordinance that allowed the owners of two-thirds of the property abutting a street to establish building setback lines. The evil the Court attacked was the delegated power of some property owners "to virtually control and dispose of the proper rights of others" without any "standard by which the power thus given is to be exercised". *Id.* at 143–144, 33 S.Ct. at 77. In *Washington v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Court struck down an ordinance which required the approval of owners of two-thirds of the property within 400 feet of a proposed home for the aged poor before the facility could be constructed. Again, the Court objected that the ordinance was "uncontrolled by any standard or rule prescribed by legislative action". *Id.* at 121–122, 49 S.Ct. at 52. Property owners, the Court observed, were "not bound by any official duty, but [were] free to withhold consent for selfish reasons or arbitrarily". *Id.*

The Court cited both these cases with approval in *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 677–678, 96

S.Ct. 2358, 2363–2364, 49 L.Ed.2d 132 (1976). There the Court upheld a city charter provision requiring proposed land use changes to be ratified by 55% of the people voting at a city-wide referendum. A referendum to a legislative body's entire constituency cannot, the Court said, "be characterized as a delegation of power." *Id.* at 672, 96 S.Ct. at 2361. "In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature." *Id.* This was far different from "the standardless delegation of power to a limited group of property owners condemned by the Court in *Eubank* and *Roberge*". *Id.* at 678, 96 S.Ct. at 2364.

*Eubank* and *Roberge* do not preclude a legislative body from conditioning regulation on local approval. In *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), Congress by statute authorized the Secretary of Agriculture to set standards for the type, grade, size, condition, and other characteristics of tobacco sold at auction. In any market designated by the Secretary and approved by two-thirds of the growers, no tobacco could be sold unless it had been inspected and certified by the Secretary's representative. The Court upheld the statute, distinguishing it from the legislation in *Carter* and *Roberge.* In those cases, the referendum was to set applicable standards; in *Currin,* the referendum was only to accept regulation standards determined by the Congress and the Secretary. The Court explained:

> This is not a case where a group of producers may make the law and force it upon a minority or where a prohibition of an inoffensive and legitimate use of property is imposed not only by the legislature but by other property owners. Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of those conditions.

*Id.* at 15–16, 59 S.Ct. at 387 (citations omitted).

Thus, a referendum does not involve an improper delegation of governmental power if it is to the entire constituency or if it is

simply a condition of the application of legislatively determined regulation. A referendum does involve a delegation of power when the voters of a group themselves determine what the law or regulation is to be, as well as whether it is to be applied to them. Such a delegation has never been approved by the Supreme Court.

The flaw with referenda in the Boll Weevil Act is similar to that identified in *Carter:* the Act places decisions affecting cotton growers not in the hands of the public or its government, but in the hands of a few cotton growers. A referendum under the Act carries when approved by two-thirds of those voting or by those farming more than half the cotton acreage in the zone. TEX. AGRIC. CODE § 74.114(g). Assessments were approved in five of the six established zones by the following percentages of eligible voters: 33% in the High Plains; 29% in the Rolling Plains Central; 27% in Winter Garden; 68% in the Rolling Plains South; and 27% in the Lower Rio Grande Valley. Thus, in all but one instance one-third or less of the cotton growers in a zone imposed assessments on all the other cotton growers in the zone. *Carter* condemned as "legislative delegation in its most obnoxious form" the power of a majority in one industry to control the affairs of an unwilling minority. Under the Act before us, a minority of cotton growers can control the affairs of an unwilling majority.

The problem is not simply that referenda may carry on the vote of a very small group of cotton growers. The outcomes of many elections are determined by a minority of voters. If the issue were whom to choose as a representative of the people, or whether to accept regulation proposed by the people's representatives, as in *Currin,* the fact that a small number of people voted in the election would not be of constitutional significance. But when the electorate consists not of all the citizens in an area but of the members of one industry, the referendum may be very unfair.

For example, the Act contemplates that when a zone is established and an assessment approved, every cotton grower in the zone must pay the assessment, whether his cotton is infested with boll weevils or not.

The reason for this scheme appears to be that boll weevils cannot be eradicated except over a large area; one farmer may eliminate the insects from his field, but they may simply move to his neighbor's field. Once the first farmer ceases his efforts, the insects may return. However, farmers who are barely surviving economically must weigh the risk of infestation in deciding whether to spend limited resources for pesticides and other efforts. The Act allows those in a stronger financial position to force those in a weaker position to contribute to eradication programs when they otherwise would not do so; conversely, it also allows growers in a weaker position to prevent all concerted eradication efforts.

Thus, I agree with the Court that the delegation of power to the Foundation is unconstitutional. The use of referenda does not save it.

## II

The Court does not reach the federal procedural due process and state open courts challenges to the Act. While resolution of these issues are not necessary to the result in these cases, I believe a word should be said about them to guide the Legislature in the event it chooses to enact other boll weevil eradication legislation.

The Act does not allow for a hearing before the Foundation, the Commissioner, or the Department to protest an assessment, nor does the Act permit judicial review of an assessment. As JUSTICE CORNYN's opinion points out, under Texas law the lack of a statutory right to judicial review of an administrative decision does not mean that judicial review is never allowed. A person has a right to judicial review of an administrative decision which violates the person's constitutional rights or adversely affects his vested property rights, even if no right to review is conferred by statute. *Stone v. Texas Liquor Control Bd.,* 417 S.W.2d 385, 385–386 (Tex. 1967); *Brazosport Sav. & Loan Ass'n v. American Sav. & Loan Ass'n,* 161 Tex. 543, 342 S.W.2d 747, 750–751 (1961); *City of Amarillo v. Hancock,* 150 Tex. 231, 239 S.W.2d 788, 790 (1951). Clearly, enforcing a monetary assessment against a grower and

his property adversely affects his vested property rights. Thus, a cotton grower would be entitled to judicial review of an assessment despite the lack of any provision in the Act. The Act is not invalid because it does not provide for judicial review; review is simply required.

This right to judicial review does not, however, satisfy federal procedural due process requirements. In *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 37, 110 S.Ct. 2238, 2250–2251, 110 L.Ed.2d 17 (1990), the Supreme Court held that postdeprivation process for the exaction of taxes satisfies constitutional requirements only if the taxpayer is afforded "an opportunity to contest the validity of the tax and a 'clear and certain remedy' designed to render the opportunity meaningful by preventing any permanent unlawful deprivation of property." *Id.* at 40, 110 S.Ct. at 2252. Even if assessments under the Act were taxes—as I believe, but the Court does not—a cotton grower is not assured a "clear and certain remedy" in an action for judicial review. He cannot be assured recovery of wrongfully charged assessments or damages for wrongful collection efforts, including destruction or seizure of his crops, because the Foundation may not have funds available. In the Lower Rio Grande Valley zone, for example, the Foundation is $9 million in debt. Judicial review after collection efforts have been undertaken may afford no relief whatever.

Moreover, given that the Court holds that the assessments are not taxes but regulatory fees, the rule in *McKesson* does not apply. Postdeprivation procedures satisfy due process requirements for taxes because "[a]llowing taxpayers to litigate their tax liabilities prior to payment might threaten a government's financial security, both by creating unpredictable interim revenue shortfalls against which the State cannot easily prepare, and by making the ultimate collection of validly imposed taxes more difficult." *Id.* at 36, 110 S.Ct. at 2250. This rationale does not apply to collection of regulatory fees. Instead, the general rule of *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), applies.

*Fuentes* held that replevin statutes that allow seizure of property before a hearing do not meet constitutional due process requirements. The Boll Weevil Act allows the Foundation, a private corporation privately managed, to destroy growing crops, even if not infested by boll weevils, with no hearing and no notice other than the notice of the original assessment. A cotton grower has no opportunity to argue that he received another grower's assessment by mistake, or that there was an error in calculating the assessment, or that the subject acreage is not as shown in the assessment, or that another person is liable for the assessment because of ownership of the crop or property. It is possible, of course, for a cotton grower to sue for judicial review before the Foundation undertakes any action to enforce its assessments, just as it was possible in *Fuentes* for the defendant to sue to prevent replevin before it occurred. But due process is not satisfied by the possibility that an owner may sue before he is deprived of his property. It is possible, under the Act, for a cotton grower to find Foundation-ordered plows in his field with no prior opportunity to stop them. "[N]o later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Id.* at 82, 92 S.Ct. at 1995.

When the actor seeking property, such as collection of an assessment, is governmental, the requirement of a predeprivation hearing is not absolute. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court held that the requirements of due process depended on a weighing of three factors: the private interest affected, the risk of error in the procedures used and the probable value of additional safeguards, and the government's interest in pre-hearing seizure, including the burden additional requirements would impose. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 52, 54, 114 S.Ct. 492, 500, 501, 126 L.Ed.2d 490 (1993) (applying the *Mathews* factors to an action for civil forfeiture of real property). Applying these factors in the present case demonstrates that the Act is invalid. The private interests affected—cotton growers' interest in their

funds, crops, and property—are significant. Although the risk of error may not be great—the Foundation need only multiply the assessment by a grower's acreage, or in some cases, production—additional safeguards, such as the right to protest and hearing offered taxpayers, would eliminate errors. The State has no legitimate interest in seizing cotton growers' crops or destroying them before growers have had an opportunity to protest and be heard. The State affords taxpayers such rights; there is no reason why cotton growers should not have them as well.

## III

As I have said, I also agree with JUSTICE GONZALEZ' opinion that assessments under the Act are a tax on the occupation of agriculture in violation of Article VIII, Section 1(c) of the Texas Constitution.

For all these reasons, I join in the Court's judgment holding the Act unconstitutional.

CORNYN, Justice, joined by ENOCH, SPECTOR and ABBOTT, Justices, concurring in part and dissenting in part.

### I.

While I agree with a majority of the Court that the assessments levied by the Foundation are not an unconstitutional occupation tax and also do not violate the growers' right to equal protection, I disagree with CHIEF JUSTICE PHILLIPS's opinion that Subchapter 74D of the Texas Agriculture Code is an unconstitutional delegation of legislative power in violation of article II, section 1 of the Texas Constitution. Neither does Subchapter 74D violate the growers' right to due process or the open courts provision of the Texas Constitution.

In striking down this statute, the Court commits four major errors that ultimately threaten the heretofore established role of quasi-governmental entities under Texas law. Repeatedly, we have recognized that legislative delegations of authority are an essential part of modern governance in an increasingly complex society. *See, e.g., National Ass'n of Indep. Insurers v. Texas Dep't of Ins.*, 925 S.W.2d 667 (Tex.1996); *Texas Ass'n of Busi-*

*ness v. Texas Air Control Bd.*, 852 S.W.2d 440, 451 (Tex.1993). The Court's decision in this case, ironically enough, tends to prove rather than refute the arguments of those administrative law scholars who contend that state delegation cases lack a defining principle. *See, e.g.,* Greco, *Standards or Safeguards: A Survey of the Delegation Doctrine in the States,* 8 ADMIN. L.J. 567 (1994) (citing MANDELKER, ET AL., STATE AND LOCAL GOVERNMENT IN A FEDERAL SYSTEM 599 (2d ed.1983)).

That is not to say that the concerns embodied in the nondelegation doctrine are trivial; just the opposite is true. There can be no doubt that when lawmaking power is delegated to an administrative agency to carry out the Legislature's policy goals, that agency is necessarily given the power to give substance to that legislative policy. But as the United States Supreme Court has said, given proper safeguards, this delegation is both proper and necessary:

> So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." [citing *J.W. Hampton Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928) ].

> ... [O]ur jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.

*Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989).

Given that the same concerns and conditions exist in our state system, it is not surprising that we have likewise acknowledged the propriety of legislative delegation to carry out legislative purposes, as long as there are established reasonable standards to guide the agency to whom those powers are delegated. *See e.g., Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 740 (Tex. 1995). We do not require these standards to

be comprehensive. To the contrary, we have said that "[r]equiring the legislature to include every detail and anticipate unforeseen circumstances ... would defeat the purpose of delegating legislative authority." *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992).

My fundamental objection to the Court's approach is that while the nondelegation doctrine has undergone at least five stages of development in our national jurisprudence, *see* Greco, *Standards or Safeguards*, 8 ADMIN. L.J. at 569 (categorizing these as "the Early Stage, the Public Interest Stage, the 'Strict' Standards Stage, the 'Loose' Standards Stage, and the Procedural Safeguards Stage"), the Court's approach instead represents a stage of arrested development. The Court's extraordinary skepticism of this particular delegation emanates from two Supreme Court cases, dating back to the Court's "Strict" Standards Stage during the first half of this century, both of which, although never expressly overruled, have been limited to their facts. *Id.* at 572 n. 31; DAVIS, ADMINISTRATIVE LAW TREATISE § 3:8 (2d. ed.1978). Not surprisingly, this strict nondelegation approach is followed by only a minority of the states. *See* Greco, *Standards or Safeguards*, 8 ADMIN. L.J. at 578. It is on this flimsy foundation that the Court's public policy arguments are erected.

Second, though the Court acknowledges the correct standard for review of a facial challenge to the constitutionality of a statute, it does not correctly apply that standard. Under a facial challenge, like that made here, the challenging party must prove that the statute, by its terms, "*always operates un-*

*constitutionally.*" *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex.1995) (emphasis added); *see also Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 625 (1996). That burden has not been met here.

Third, the Court strains to conclude that the Texas Boll Weevil Eradication Foundation is a "private" entity.[1] Characterizing the Foundation as a "private" agency is the lynchpin of the Court's decision—only by using this approach can the Court feel itself justified in declaring that "this is an extraordinary case," 952 S.W.2d at 475, in a effort to limit both the known and unknown ramifications of its opinion.

It is the unknown ramifications of the Court's new test that ought to be of the most concern to the Court. The Court's new test will no doubt apply to delegations ranging from "school choice"[2] to private prisons.[3] In fact, "private" delegations are used extensively in Texas government, have been routinely upheld by this and other Texas courts, and given proper standards and oversight by the delegating authority, these delegations raise no constitutional concerns. For instance, the Court does not consider whether or how this new test might affect the continuing viability of the Relinquishment Act, which dedicates revenue from state-owned oil and gas reserves to the Permanent School Fund, the constitutionality of which this Court upheld against a delegation challenge in *Greene v. Robison*, 117 Tex. 516, 8 S.W.2d 655, 656 (1928) (allowing private persons to sell or lease oil and gas owned by the state

---

1. The Legislature designated the Foundation a "governmental unit." TEX. AGRIC CODE § 74.109(f). It also conferred official immunity on the Foundation Board members, *see id.* § 74.110, exempted the Foundation from taxation, *see id.* § 74.109(d), afforded indemnification to the Foundation and Board(presumably from the state treasury), *id.*, and specified that the Foundation must exercise its rulemaking authority in compliance with state requirements. *Id.* § 74.120.

2. *See* Colona, *The Privatization of Public Schools—A Statutory and Constitutional Analysis in the Context of the Wilkinsburg Education Association v. Wilkinsburg School District*, 100 DICKIN-

SON L. REV. 1027, 1048 (1996) (arguing that delegation of public education to private entities is an unconstitutional delegation); Egle, *Comment: The Constitutional Implications of School Choice*, 1992 WIS. L.REV. 459, 505–07 (1992) (questioning whether delegation to parents and students of the power to assess the quality of school performance with state playing minimal role violates nondelegation doctrine).

3. *See* Blakely and Bumphus, *Private Correctional Management: A Comparison of Enabling Legislation*, 60 FED. PROBATION 49 (1996); Dipiano, *Private Prisons: Can They Work? Panopticon in the Twenty-first Century*, 21 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 171, 172, 196, 199 (1995).

"upon such terms and conditions as such [private person] may deem best" subject only to minimum prices set in the statute). Similarly, in *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504 (Tex. 1995), this Court upheld the constitutionality of the Workers' Compensation Act against an open courts, equal protection, and a substantive due course of law challenge arising out of the use of the American Medical Association's Guides to the Evaluation of Permanent Impairment for determining injured workers' impairment ratings. Clearly, the Act delegates to the American Medical Association (AMA), a private national association of physicians, the task of promulgating standards for translating a worker's job-related injury into an impairment rating to determine compensation benefits. Although no separate delegation argument was advanced in that case, the constitutional complaints that were urged involve many of the same considerations that arise in a delegation challenge. Yet the Court had no trouble upholding the use of the AMA Guides. *Cf. Madrid v. St. Joseph Hosp.*, 122 N.M. 524, 928 P.2d 250, 256–259 (1996) (upholding the use of the AMA Guides against a constitutional nondelegation challenge).

We also recently declined to disturb the decision of the Third Court of Appeals upholding a legislative delegation to the Texas Automobile Insurance Plan Association in *Office of Public Insurance Counsel v. Texas Automobile Insurance Plan*, 860 S.W.2d 231 (Tex.App.—Austin 1993, writ denied). The Association, which is charged with administering the Safety–Responsibility Act's scheme for providing motor vehicle liability insurance to high risk drivers, is composed exclusively of private insurance companies authorized to do business in Texas. Finding adequate safeguards against the arbitrary exercise of power under the statutory scheme, the court of appeals had no apparent trouble upholding this particular private delegation. *Id.* at 237.

Nor does the Court consider the impact of its decision on the Legislature's common practice of delegating eminent domain powers to private entities. *See, e.g.,* TEX. NAT. RES.CODE § 111.019 *et seq.* (granting common

carriers power of eminent domain when "necessary for the construction, maintenance, or operation of the common carrier pipeline"); TEX.REV.CIV. STAT. art. 1417 (granting telegraph corporations the power to condemn property "for the use of the corporation"); TEX.REV.CIV. STAT. art. 1435a (granting certain private oil and gas companies the power of eminent domain); TEX.REV.CIV. STAT. art. 1439 (granting power of condemnation to sewer companies "whenever it be made to appear that the use of any such private property is necessary for the successful operation of such sewer system, and when it also be made to appear that such sewer system is beneficial to the public use, health or convenience"); TEX.REV.CIV. STAT. art. 6535 (granting certain railroad corporations right of eminent domain "for the purpose of acquiring rights of way upon which to construct and operate their lines of railways and sites for depots and power plants"); TEX.REV.CIV. STAT. art. 1433 (providing that "[w]hen deemed necessary to preserve the public health" a water company shall have the right of eminent domain to condemn private property "necessary for the construction of supply reservoirs or standpipes for water work"). Ironically, JUSTICE HECHT argues that the Foundation "wields more legislative power than any other privately chartered nonprofit corporation in Texas, or, as far as I can tell, in the history of Texas." 952 S.W.2d at 479. But not only have similar delegations to similar private organizations been upheld in other states, *see, e.g., Dukesherer Farms, Inc. v. Ball*, 405 Mich. 1, 273 N.W.2d 877 (1979) (upholding the Michigan Cherry Promotion and Development Program against a constitutional challenge based, in part, on improper delegation), it is difficult for me to imagine a more profound delegation of governmental power than that given by the Texas Legislature to numerous private entities to take private property for public use under the sovereign power of eminent domain. How these delegations would fare under the Court's new test is uncertain at best.

Even this Court delegates to a private entity the task of approving the law school course-of-study requirements for would-be Texas lawyers. Rather than engage in the

laborious, expensive, and specialized task of assessing the nation's law schools ourselves, we delegate this function to the American Bar Association, a voluntary national association of lawyers. *See Rules Governing Admission to the Bar of Texas,* Rule III(a)(1) (requiring graduation from an "approved law school"); Rule I(a)(3) (defining "Approved law school" as one "approved by the American Bar Association"); *see also* Rules IV, VII, VIII, and X (allowing Board of Law Examiners and District Committees on Admissions to determine whether applicants for bar possess good moral character and fitness). Not surprisingly, the Legislature has also embraced this model for a host of other certifications and licenses. *See, e.g.,* TEX. GOV'T CODE § 441.007 (requiring graduation from privately accredited library school for permanent certification as county librarian); TEX. HEALTH & SAFETY CODE § 142.006 (allowing Department of Health to issue license to a privately accredited home and community support services agency), § 222.024 (exempting hospitals accredited by Joint Commission on Accreditation of Healthcare Organization, the American Osteopathic Association, or other national accreditation organization from licensing inspections), § 401.425 (allowing alternative certification of privately accredited mammography systems), § 824.002 ( exempting zoos accredited by the American Association of Zoological Parks and Aquariums from regulation under Chapter 824); TEX. HUMAN RES.CODE § 50.015 (requiring graduation from accredited program for certification as a social worker); TEX.REV.CIV. STAT. art. 4495b–1 § 2(3)(defining "physician assistant" as a person who graduated from a program "accredited by the American Medical Association's Committee on Allied Health Education and Accreditation and who has passed the certifying examination administered by the National Commission on Certification of Physician Assistants"); TEX. NAT. RES.CODE § 113.052 (allowing agency to adopt the published codes of the National Board of Fire Underwriters, the National Fire Protection Association, the American Society for Mechanical Engineers, and other nationally recognized societies as standards applying to storage, delivery, and handling of liquefied petroleum gas); *see also Dudding v. Automatic Gas Co.,* 145 Tex. 1, 193 S.W.2d 517, 519 (1946) (upholding adoption of standards recommended by National Fire Protection Association and National Board of Fire Underwriters regarding liquefied petroleum gas). Significantly, "private" delegations offer vast and varied expertise to Texas government at no additional cost to taxpayers and without bloating an already sizable bureaucracy.

Finally, only by leapfrogging a nearly unbroken string of decisions from this Court and the United States Supreme Court upholding legislative delegation of authority to various agencies, many with far less legislative guidance than was provided here, is the Court able to apply its new, stricter "private delegation" test in place of long-established Texas law. In my view, this Court's decisions provide more than sufficient guidance—and certainly more authority—for evaluating the propriety of the delegation in this case. Our decisions also compel a determination that Subchapter 74D is not facially unconstitutional.

II.

Relying primarily on Louis Jaffe's sixty-year-old law review article, *Law Making By Private Groups,* 51 HARV.L.REV. 201 (1937), the Court concludes that entities like the Foundation are wholly "private." At the same time, the Court concedes that they do "not find it easy to categorize the Foundation as either a public or private agency." 952 S.W.2d 470. The Court also fails to adequately explain why this largely fictional distinction, which leads it to propose an "either/or" choice, is so important that this entire statute should turn on it. I submit that the Foundation is neither wholly public nor wholly private, but rather it has attributes of each.

But as it turns out, this distinction does not really matter. What does matter more than drawing strained and artificial distinctions between public and private actors is whether the Foundation has been given adequate legislative guidance and whether its discretion is subject to appropriate oversight and other legal constraints. Ultimately, the legitimate constitutional concerns for un-

checked abuse of power giving rise to the nondelegation doctrine are the same whether the Foundation is characterized as public or private. Thus, the Court's creation and application of a new test for private delegations is simply unnecessary.

### III.

As I have previously noted, we have repeatedly held that the Legislature may delegate authority to agencies to carry out legislative purposes so long as it establishes " 'reasonable standards to guide the entity to which the powers are delegated.' " *Edgewood*, 917 S.W.2d at 740 (quoting *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992)). " 'Such standards may be broad ... [when] conditions must be considered which cannot be conveniently investigated by the legislature,' " *Lone Star Gas Co.*, 844 S.W.2d at 689 (quoting *State v. Texas Mun. Power Agency*, 565 S.W.2d 258, 273 (Tex.Civ.App.—Houston 1978, writ denied)), and at the same time, they should be "reasonably clear and hence acceptable as a standard of measurement." *Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d 278, 280 (1960). The Court has recognized six categories of allowable delegations:

(1) delegations when the Legislature cannot practically and efficiently exercise powers (such as determining rail rates, questions of public convenience and necessity, and granting permission to drill oil wells);

(2) delegations to administrative bodies of the authority to make rules to implement statutes;

(3) delegations to find facts and ascertain conditions upon which an existing law may operate (for example, the authority given the Railroad Commission, the Public Utility Commission, the Texas Natural Resource Conservation Commission);

(4) delegations of legislative authority that set up broad standards, leaving to the delegate to make rules and determine facts to which the legislative policy is to apply, when the conditions to be considered cannot be easily investigated by the Legislature;

(5) delegations of the power to fix rates within prescribed limits to cover specified items of cost; and

(6) delegations of the power to determine the question of necessity of taking land for public use.

*Housing Auth. v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 87 (1940).

In testing the reasonableness of a particular delegation, we have required varying degrees of specificity in standards depending on the nature of the power conferred, the recipient of the power, and the subject matter. *See, e.g., Edgewood*, 917 S.W.2d at 740 (upholding delegation to Commissioner of Education to adopt rules *"necessary* for the implementation of" Chapter 36 of the Education Code); *Lone Star Gas Co.*, 844 S.W.2d at 685 (upholding delegation to Railroad Commission of authority to, among other things, "do all things necessary for the conservation of oil and gas and prevention of waste of oil and gas and ... [to] adopt rules and orders as may be necessary for those purposes"); *Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d 278, 280–281 (1960) (upholding delegation to the State Board of Insurance to determine whether any officers or directors of an insurance carrier seeking a Certificate of Authority were "not worthy of the public confidence" and noting the general terms that have been held sufficient as administrative standards by other courts, including "just and reasonable," "public interest," "unreasonable obstruction" to navigation, "reciprocally unequal and unreasonable," "public convenience, interest, or necessity," "[materials] of inferior quality," "unfair methods of competition," "reasonable variations," "unduly or unnecessarily complicate the structure" of a holding company system, and "unfairly or inequitably distribute voting power among security holders"); *Southwestern Sav. & Loan Ass'n v. Falkner*, 160 Tex. 417, 331 S.W.2d 917, 920 (1960) (upholding right of Banking Commissioner to ascertain "whether the *public convenience and advantage* will be promoted ... and whether the [neighboring] population ... affords a *reasonable promise of adequate support* " before granting approval of a branch office);

*Higginbotham,* 143 S.W.2d at 81, 83, 86 (upholding statute giving housing authority right to condemn property after determining that the city has "insanitary or unsafe inhabited dwelling accommodations" and to set rental rates that are "the lowest possible rates consistent with its providing decent, safe, and sanitary dwelling accommodations" at "no higher rates than it shall find to be necessary in order to produce revenues ... sufficient [to meet certain expenses and create a reserve]" and to select housing for tenants that is "within the financial reach of [low income] persons," and which it deems "necessary to provide safe and sanitary accommodations"). As these cases demonstrate, we have upheld numerous delegations with far more general grants of authority than that in Subchapter 74D.

Notwithstanding the Court's assertion that Subchapter 74D lacks sufficiently specific standards, the statute contains relatively comprehensive standards to guide both the Commissioner of Agriculture (a statewide elected official) and the Foundation in their joint efforts to execute the legislative mandate to "suppress and eradicate boll weevils and other cotton pests." TEX. AGRIC. CODE § 74.101(c). Initially, the Commissioner is required to select a nonprofit organization that "can best carry out the purposes of [Subchapter 74D]" and must certify that the organization's petition "complies with [Subchapter 74D]" and "can adequately represent the interests of cotton growers in the proposed eradication zones." *Id.* § 74.103(d)-(e). The Commissioner may revoke the certification if it "fails to meet the requirements of [Subchapter 74D]." *Id.* § 74.104(b). Apparently, this includes the power to revoke the Foundation's certification for its failure to conduct or abide by the results of Board elections or assessment referenda pursuant to the requirements of sections 74.105 (eradication zone referenda), 74.106 (Board elections), 74.113 (assessment referenda), and 74.114 (procedures for Board elections and referenda), or its failure to obtain the Commissioner's approval for changing the voting status of a Board member, *see id.* § 74.107(b) (requiring Commissioner approval to "change the number of board positions or the eradi-

cation zone representation on the board"), or otherwise comply with the requirements of the statute. Additionally, the statute requires that the Board use revenue collected "*solely* to finance programs approved by the commissioner as *consistent* with [Subchapter 74D] and applicable provisions of the constitution." *Id.* § 74.109(h) (emphasis added).

The Court refuses to acknowledge that sections 74.104(b)and 74.109(h) confer such broad oversight powers upon the Commissioner. Section 74.104(b) can, however, be reasonably read to give the Commissioner the power to revoke the Foundation's authority to operate under certain circumstances. Similarly, the statute clearly requires Commissioner approval of Foundation expenditures. The procedures for implementing these duties are subject to the broad rule-making power that the Legislature has conferred upon the Commissioner. *See* TEX. AGRIC. CODE § 74.120. Simply stated, the statute repeatedly requires the Foundation to operate in accordance with both statutory standards, *see, e.g., id.* §§ 74.108, 74.113, and the Commissioner's explicit grants of oversight authority. *See, e.g., id.* §§ 74.107, 74.109.

The Legislature has also specified the powers of the Board. These include the power to "conduct programs *consistent with the declaration of policy*" stated by the Legislature, to "borrow money *as necessary to execute this chapter,*" and to take other action and exercise other authority "*as necessary* to execute any act *authorized* by [Subchapter 74D] or the Texas Non–Profit Corporation Act." *See id.* § 74.108(a)(4), (6), and (7) (emphasis added). The statute also specifies when the Board may add an area to an eradication zone and when and how assessments can be collected in those added areas. *See id.* § 74.108(b)-(c). In proposing assessments, the Foundation must determine the assessment "needed" to "finance programs of marketing, promotion, research, and education calculated to increase the production and use of cotton" and the Foundation may use the funds only for eradication in that zone, operating costs (including payments of debt), and "other programs consistent with the declaration of policy" as stated by the

Legislature in the statute. *Id.* § 74.113(a), (f); *see also id.* § 74.101.

The statute also contains guidelines for how the Foundation should implement eradication programs. As the Court has noted, the statute requires the Foundation to use the "best available integrated pest management techniques." *Id.* § 74.101(a)(3). What the Court fails to acknowledge, however, is that the phrase "integrated pest management" is expressly defined by statute as "the coordinated use of pest and environmental information with available pest control methods to prevent *unacceptable levels* of pest damage *by the most economical means* and with the *least possible* hazard to people, property, and the environment." *Id.* § 74.102(12) (emphasis added). This definition surely contains sufficiently specific standards to pass muster under this Court's nondelegation jurisprudence. Similarly, the definitions of "eradication" and "infested" contain additional specific guidance. " 'Eradication' means elimination of boll weevils or pink bollworms *to the extent that the Commissioner does not consider further elimination* of boll weevils or pink bollworms *necessary to prevent economic loss* to cotton growers." *Id.* § 74.102(6) (emphasis added). " 'Infested' means the presence of the boll weevil or pink bollworm in any life stage or the existence of *generally accepted entomological evidence* from which it may be concluded *with reasonable certainty* that the boll weevil or pink bollworm is present." *Id.* § 74.102(11) (emphasis added).

Thus, the delegation to the Foundation fits the description of at least four types of allowable delegation outlined in *Higginbotham.* First, the Legislature cannot practically and efficiently exercise many of the powers delegated to the Foundation, such as determining the level of assessments needed to achieve the statute's goals. Second, the statute delegates to the Foundation and Commissioner the authority to make rules to implement the statute. Third, the Foundation and Commissioner are given the power to find facts and ascertain conditions upon which Subchapter 74D may operate, such as determining when a field is infested and what crops present a threat to the program. Fourth, the statute

sets up broad standards, leaving to the delegate to make rules and determine facts to which the legislative policy is to apply, when the conditions to be considered, such as level of infestation and which types of integrated management practices to use, cannot be easily investigated by the Legislature. *See Higginbotham,* 143 S.W.2d at 87.

### IV.

Not only does the Court wrongly apply the correct legal standard to decide the constitutionality of the statute, it reaches several erroneous conclusions even under its own new test. Though the Court purports to limit its new test to "private" delegations, it does not explain why our long-standing test for improper delegations is inadequate, nor does it explore the potential negative ramifications of this new standard to other delegations. If, as the Court recognizes, broad delegations of lawmaking authority without adequate safeguards are a threat to democratic government, what difference does it make whether the delegation is to a bureaucrat, an appointed commission, or a quasi-governmental entity like the Foundation? Given adequate standards and oversight, such as that imposed on the Foundation under Subchapter 74D, this delegation is both constitutionally permissible and in the public interest.

Though the Court's decision does not ultimately rely on the Foundation's authority to promulgate rules, the violation of which constitutes a criminal offense (a Class C misdemeanor punishable by a fine not to exceed $500, *see* TEX. AGRIC. CODE § 74.126; TEX. PENAL CODE § 12.23), the Court asserts that this authority "strongly suggests an improper private delegation." I disagree. The prospect of invalidating a delegation on this basis jeopardizes innumerable other statutes covering a multitude of subjects in which the Legislature has directed that a violation of agency rules is a criminal offense. *See, e.g.,* TEX. AGRIC. CODE §§ 18.008 (certification of organic produce), 61.018 (labeling and sale of seed), 71.058 (florists), 75.022 (herbicides), 121.010 (grading of roses), 134.023 (aquaculture licensing); TEX. EDUC.CODE §§ 37.102 (school safety), TEX. HEALTH & SAFETY CODE

§§ 81.085 (quarantines), 145.013(tanning facilities licensing), 361.221, 361.2215, 361.2225 (solid waste disposal), 361.563 (transportation of medical waste), 438.005 (sale of unpackaged food), 753.011 (flammable liquids), Tex. Nat. Res.Code §§ 91.002 (conservation and regulation of oil and gas), 131.305 (waste discharges from uranium surface mines), Tex. Parks & Wildlife Code §§ 12.607 (possession of wild animals), 43.077 (private bird hunting); Tex. Trans. Code § 548.604 (vehicle inspection); Tex. Water Code §§ 26.2121 (water quality permits), 60.078 (navigation district regulations). These grants of authority to promulgate rules punishable by a fine are no more expansive than necessary to allow the enforcement of an agency's rules. In this case, why would the Legislature delegate authority to administer a boll weevil eradication program and yet withhold from the Foundation the power to enforce its rules? Of course, no growers complain that they have been prosecuted for violating the rules of the Foundation. And, although I would not strike down the statute on this basis, even the Court recognizes that the proper course of action would be to strike down the particular penalty provisions, and sever them from the rest of the statute. *See Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex.1990); *Sharber v. Florence,* 131 Tex. 341, 115 S.W.2d 604, 606 (1938); *Western Union Tel. Co. v. State,* 62 Tex. 630, 634 (1884). If this is so, then the fifth factor of the Court's test is simply unnecessary.

That the delegation is to a quasi-governmental entity as opposed to a "pure" administrative agency is irrelevant when, as in this case, the entity is required to promulgate rules consistent with the statute conferring its authority and consistent with rules promulgated by the Commissioner. *See* Tex. Agric. Code § 74.120. The Board is given the authority to set penalties, after reasonable notice, for a grower's failure to pay assessments. *Id.* § 74.115(a). But it is the statute itself, and not the Board, that determines the circumstances under which a grower's crop may be destroyed for nonpayment of assessments and the specific procedures that must be followed before destroying the crop. *See id.* § 74.115(b). Only the Commissioner, and not the Foundation, is given

the authority to establish rules regarding when planting of cotton may be prohibited "if there is reason to believe planting will jeopardize the success of the program or present a hazard to public health or safety," and to order destruction of cotton when such rules are violated. *See id.* § 74.118. Only the Commissioner, and not the Foundation, is given the authority to destroy and treat volunteer or noncommercial cotton and to determine when destruction of commercial cotton is "necessary to carry out the purposes of [Subchapter 74D]." *Id.* § 74.119. Notably, the statute requires that the initial zone referendum include a summary of the penalties for noncompliance with rules adopted under the statute. *Id.* § 74.105(c)(3). The growers, therefore, may vote down a zone referendum if they consider the penalties to be too severe. Notwithstanding the "David v. Goliath" characterization by Chief Justice Phillips and Justice Hecht, each cotton grower, no matter how large or how small, is eligible to vote in any election. *See id.* §§ 74.102, 74.114; 4 Tex. Admin. Code § 3.1. In other words, one grower, one vote. Under these circumstances, the danger of large-grower domination in an election is minimal.

While the Court argues that there is a significant difference between the *requirement* that the Commissioner promulgate rules in some instances and the *authority* of the Commissioner to promulgate rules in other instances, as I have already noted, we have long held that it is not necessary for an administrative agency to establish detailed rules before carrying out its statutory duty when the statute provides a sufficiently definite standard. *See Jordan,* 334 S.W.2d at 280–81 (citing *Southwestern Sav. & Loan Ass'n v. Falkner,* 331 S.W.2d at 917). The Commissioner is himself politically accountable, and is certainly capable of promulgating additional rules consistent with the statute as he deems necessary. Even so, in those instances in which the statute allows, but does not require the Commissioner to promulgate rules, the statute provides sufficiently definite standards to pass constitutional muster.

The Court also errs in its conclusion that Subchapter 74D lacks adequate procedures for the growers to contest Foundation ac-

tions. Rather, the cotton growers are provided with ample opportunity to challenge Foundation and Commissioner decisions and to seek redress in the courts when necessary. The statute itself repeatedly requires that notice be provided to those subject to its jurisdiction. *See, e.g.,* TEX. AGRIC. CODE §§ 74.106, 74.115, 74.116, 74.118, 74.119, 74.120. The statute also subjects any rule-making by the Commissioner and the Foundation to the general requirements of Texas law governing administrative procedure. *See* TEX. AGRIC. CODE § 74.120(c); *see also* TEX. GOV'T CODE § 2001. *et seq.* (Administrative Procedure Act). This includes judicial review of such rules if it is alleged that a rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege. *See* TEX. GOV'T CODE § 2001.038. In addition, any person against whom the Department of Agriculture has assessed a penalty is entitled to an appeal, including a hearing in accordance with the Texas Administrative Procedure Act. *See* 4 TEX. ADMIN. CODE § 3.57. The Foundation is also required to appoint an assessment appeals committee to adopt policies and procedures for grower appeals of the amount of assessments. *See* 4 TEX. ADMIN. CODE § 196.1(i). Supplementing these administrative safeguards, however, Texas law has long recognized that even in the absence of an express right to judicial review of agency actions, such a right is implied when the complainant alleges that the statute has been unconstitutionally applied. *See Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 714–715 (1959); *Board of Ins. Comm'rs v. Title Ins. Ass'n*, 153 Tex. 574, 272 S.W.2d 95, 97–98 (1954); *see also Central Power & Light Co. v. Sharp*, —— S.W.2d ——(Tex.1997) (per curiam) (trial court had jurisdiction over constitutional challenge to statute despite party's failure to raise issue of constitutionality before agency). Plainly, meaningful administrative and judicial review is available to the growers.

Finally, the Court erroneously relies on violations of the statute to demonstrate the statute's lack of safeguards, reasoning that since the statute did not prevent what happened,[4] the safeguards are insufficient. That the Commissioner or the Foundation could violate Subchapter 74D, however, does not render the statute unconstitutional, especially under a facial challenge. Ultimately, the Court's reasoning "defeat[s] the purpose of delegating legislative authority" by "[r]equiring the legislature to include every detail and anticipate unforeseen circumstances." *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992) (citing *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961, 964 (1945)); *cf. Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex.1972) (grant of authority to the Secretary of State to finance party elections with state money could not be implied, despite recognized principle that "every specific, permissible act of a public officer need not be expressed in a statute," because it would be a violation of separation of powers).

## V.

As previously noted, the United States Supreme Court has used the delegation doctrine to strike down a statute only three times in our nation's history: *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936),[5] *A.L.A. Schechter Poultry*

---

4. For example, the Commissioner's certification of a plan containing provisions for appointed rather than elected board members, *see* TEX. AGRIC. CODE § 74.103(d)(1) (requiring the Commissioner to certify that the organization's petition for certification comply with the requirements of subchapeter 74D); § 74.106 (requiring that Board members be elected), and the Foundation's incurrence of debt, apparently without the Commissioner's approval and before passage of any assessment referenda, *see id.* § 74.109(h) (requiring that Foundation use revenue solely to finance programs approved by the Commissioner as consistent with Subchapter 74D and the Texas Constitution); § 74.113 (requiring assessment referenda), might constitute violations of the statute.

5. Whether *Carter Coal* is a nondelegation case at all is debatable. In *Mistretta*, the Supreme Court recognized *Schechter Poultry* and *Panama Refining* as the only two statutes it had ever stricken down for improper delegation. *Mistretta*, 488 U.S. at 373, 109 S.Ct. at 655. As a federal district court judge, Justice Scalia maintained that *Carter Coal* rested primarily upon a denial of substantive due process rights. *See Synar v. United States*, 626 F.Supp. 1374, 1383 n. 8 (D.D.C.), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

*Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). All three cases were decided over sixty years ago, during the heyday of the Court's hostility to President Franklin Roosevelt's New Deal. *See* HORWITZ, THE TRANSFORMATION OF AMERICAN LAW 1870–1960: THE CRISIS OF LEGAL ORTHODOXY 206–08 (1992). Although this Court has stricken statutes based on improper delegation in a few instances, we have *never* done so under circumstances like those in this case. *See Bullock v. Calvert*, 480 S.W.2d 367 (Tex.1972); *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699 (1959); *Daniel v. Tyrrell & Garth Inv. Co.*, 127 Tex. 213, 93 S.W.2d 372 (1936).

The Supreme Court has repeatedly upheld delegations in which, as in this case, the ultimate decision-making authority is vested either with a government agency or with the regulated community through referenda. For example, in *Currin v. Wallace*, the Supreme Court upheld the Secretary of Agriculture's authority to designate markets where tobacco could be bought and sold at auction upon receiving approval of two-thirds of the growers voting in a prescribed referendum.[6] 306 U.S. 1, 6, 59 S.Ct. 379, 382–383, 83 L.Ed. 441 (1939). In so holding, the Supreme Court stated, "This is not a case where Congress has attempted to abdicate, or to transfer to others, the essential legislative functions with which its is vested by the Constitution." *Id.* at 15, 59 S.Ct. at 386. (citations omitted). The Court quoted *Panama Refining*, 293 U.S. at 421, 55 S.Ct. at 248:

> The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function

in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertions would be but a futility.

*Currin*, 306 U.S. at 15, 59 S.Ct. at 387. The Court characterized the required referendum as but a restriction placed upon Congress' own regulation and not a delegation of legislative authority. *Id.* at 15, 59 S.Ct. at 386–387. The Court also distinguished the statute from that involved in *Carter Coal*, noting that, rather than "a group of producers ... [making] the law and forc[ing] it upon a minority," Congress had exercised its legislative authority in making the regulation and in prescribing the conditions of its application, one of which was the required favorable two-thirds vote. *Id.* at 15–16, 59 S.Ct. at 386–387.

That same year the Court also upheld a statute that required any order of the Secretary of Agriculture to be approved by interested producers before it could become effective. *United States v. Rock Royal Co-op.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). The Court held that, whether or not a referendum is necessary, inasmuch as Congress could put the order into effect without approval of anyone, requiring such approval is not an invalid delegation. *Id.* at 577–578, 59 S.Ct. at 1014–1015. *See also City of Eastlake v. Forest City Enter., Inc.*, 426 U.S. 668, 672–673, 96 S.Ct. 2358, 2361–2362, 49 L.Ed.2d 132 (1976) (holding that nondelegation doctrine is inapplicable to a city ordi-

---

In any event, its precedential value is dubious at best. *See United States v. Darby*, 312 U.S. 100, 123, 61 S.Ct. 451, 462–462, 85 L.Ed. 609 (1941).

**6.** With regards to one market, one of the disputed orders in *Currin* was approved by a referendum in which only 25 percent of the growers cast a vote. *Id.* at 9, 59 S.Ct. at 384. Over ninety percent of those voting, however, approved the referendum. *Id.* By contrast, voter turnout in the Board elections and assessment referenda in this case ranged from 35–85%, de-

pending on the zone. In addition, the Court concludes that because the elections are limited to eligible growers, thus is not "popular," thus supporting its conclusion that the delegation is private. This conclusion ignores the fact that under our form of government, the franchise is ordinarily limited to those subject to the governing body's jurisdiction. For example, suffrage in elections for city council, commonly understood to be "popular elections," are limited to city residents. Were this not the case, grave constitutional objections would no doubt arise.

nance requiring changes in zoning approved by City Council also be approved by 55 percent of eligible voters via referendum because "all power derives from the people, who can delegate it to representative instruments which they create. In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the Legislature") (citations omitted).

The Supreme Court has always upheld statutes in which the regulated community has been delegated considerable authority so long as the statute contains "intelligible principles" upon which decisions could be made and when an administrative agency is vested with authority to oversee the private delegates' exercise of power. For example, in *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), the Supreme Court upheld the Bituminous Coal Act of 1937 as a valid delegation despite the fact that the Act allowed organized boards composed of member coal producers to recommend minimum prices to the Commissioner. The only governing standards for establishing the minimum prices related to such concerns as the "just and equitable" price as between producers within a district, "due regard to the interests of the consuming public," the relative market values, and "fair competitive opportunities." *Id.* at 397, 60 S.Ct. at 914. Noting that the standards in the Act "far exceed in specificity others which have been sustained," the Court concluded that,

> "[c]ertainly in the hands of experts the criteria ... supplied [were] wholly adequate for carrying out the general policy and purposes of the Act. To require more would be to insist on a degree of exactitude which not only lacks legal necessity but which does not comport with the requirements of the administrative process."

*Id.* at 398, 60 S.Ct. at 915. Because the Commission had ultimate responsibility for setting prices, after the Board's recommendation, and had authority over the activities of the industry members, the Court held the delegation was "unquestionably valid." *Id.* at 399, 60 S.Ct. at 915.

Similarly, in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), the Court upheld Congress' delegation to the President of the power to increase or decrease import duties to equalize the differences in costs of production in the United States and competing countries. The Court recognized that

> Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because [the need to exercise the power] depend[s] on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of state legislation, *it may be left to a popular vote of the residents of a district to be [affected] by the legislation.* While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district.

. . . . .

> If Congress shall lay down by legislative act *an intelligible principle* to which the person or body authorized to fix such rates is directed to conform, such legislative action is not [an unconstitutional] delegation of legislative power.

*Id.* at 407, 409, 48 S.Ct. at 351, 352 (emphasis added).

The Supreme Court's reasoning in these cases is particularly applicable to the present case. Under the statute, the Foundation is allowed to take action only upon the voters' approval of the creation of the zone and the assessments. As in *Currin* and *Rock Royal*, the people subject to these assessments have the ultimate veto power. Inasmuch as the Legislature could impose a regulatory assessment to be collected for purposes of boll weevil eradication, a requirement that assessments proposed by the Foundation be approved through a referendum of growers cannot be an invalid delegation. *See Rock Royal Co-op.*, 307 U.S. at 577–578, 59 S.Ct. at

1014–1015; *Currin,* 306 U.S. at 15, 59 S.Ct. at 386–387. Nor is the delegation of the authority to establish the level of assessments to the Foundation an improper delegation because the Legislature has provided for sufficient oversight by the Commissioner of Agriculture and has provided reasonably comprehensive guidance for the remaining discretionary authority of the Foundation, particularly given the expertise of the Foundation Board members. *See Sunshine Anthracite Coal,* 310 U.S. at 397–400, 60 S.Ct. at 914–916, *Rock Royal Co-op.,* 307 U.S. at 574–578, 59 S.Ct. at 1013–1015. The Court contends that the statute "fails to meet the seventh factor" of its new test because there are no guarantees that the Board members are "experts." This is an audacious assertion indeed.[7] Perhaps the Legislature recognized that the cotton growers who earn their living by producing cotton and who elect the Board members are the best judges of the qualifications of the Board members they choose to represent them.

## VI.

Finally, I disagree that the State has violated the growers' rights to procedural due process and abridged their right to open courts.

We addressed a similar challenge in *R Communications, Inc. v. Sharp,* 875 S.W.2d 314 (Tex.1994). There, a taxpayer challenged a statute that 1) barred any form of declaratory relief, 2) conditioned suit attacking the validity of an assessment on prior payment of the taxes, 3) barred injunctive relief without prior payment of the taxes or posting of a bond, and 4) authorized summary collection procedures without the State filing suit. *See id.* at 314–315. Yet we found it necessary to invalidate only the first of these elements to remedy the system's constitutional infirmity. *See id.* at 318. "Without the recent legislative elimination of a declaratory remedy, R Communications would appear to have available a means of obtaining timely access to the courts...." *Id.* at 318.

As the Legislature has not purported to limit the growers' right to declaratory relief, they have a means of obtaining timely access to the courts. Moreover, as mentioned previously, even if the Legislature has not expressly provided a right to judicial review of Foundation actions, such a right would be implied under these circumstances. *See Davis,* 326 S.W.2d at 714–715; *Board of Ins. Comm'rs,* 272 S.W.2d at 97–98.

Obviously, the threat of destruction is a powerful collection tool for the Foundation. Even so, the penalty and collection measures in Subchapter 74D do not violate the growers' right to procedural due process or open courts. While Subchapter 74D does not expressly provide a procedure for challenging the assessments, the Commissioner has mandated the establishment of such procedures. *See* 4 TEX. ADMIN. CODE § 196.1(i). The statute does not limit the growers' existing remedies nor attempt to condition them on the growers' prepayment of the assessment. Thus, an aggrieved grower may pursue an action for declaratory or injunctive relief and may include a claim to recover erroneous or invalid assessments paid under protest. Indeed, the current lawsuits, in which the growers obtained a judgment in the trial court refunding the assessments and enjoining further collection, demonstrate the availability of meaningful judicial review.

## VII.

Accordingly, I would hold that Subchapter 74D represents a constitutionally valid delegation of power and that petitioners' facial challenge fails. The statute's "reasonable standards," *see Edgewood,* 917 S.W.2d at 740, provide adequate guidance to the Commissioner and Foundation in implementing those aspects of the statute that "cannot be conveniently investigated by the Legislature." *See Lone Star Gas Co.,* 844 S.W.2d at 689. Moreover, the statute provides adequate safeguards against the Foundation's abuse of power, most importantly the growers' right to judicial review and their right to opt in and out of the program. Therefore, because

---

**7.** That the Court then proceeds to "excuse" this "failure" does not excuse the audacity of this assertion.

I also believe the assessments are valid regulatory fees and that the statute does not violate the growers' equal protection rights, their procedural due process rights, or their right to open courts, I would reverse the trial court's judgment and uphold the statute as constitutional in all respects.

## SUPPLEMENTAL OPINION ON REHEARING

PHILLIPS, Chief Justice, delivered the opinion of the Court on rehearing, in which GONZALEZ, HECHT, CORNYN, SPECTOR, OWEN, BAKER and ABBOTT, Justices, join.

■ We did not consider in our original opinion whether our decision invalidating the Act should apply retroactively, thus requiring the Foundation to refund past assessments, or only prospectively, allowing the Foundation to retain those assessments. The general rule is that this Court's decisions apply retroactively. *See Sanchez v. Schindler,* 651 S.W.2d 249, 254 (Tex.1983). However, we have the discretion to depart from this general rule where circumstances dictate that we should apply a decision prospectively. *See, e.g., Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 518–21 (Tex.1992) (applying the three-pronged test from *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), to determine that decision invalidating school finance system should apply prospectively).

The Foundation, joined by amicus curiae Farm Credit Bank of Texas, argues on rehearing that we should exercise that discretion here and limit our judgment to prospective application. In particular, the Foundation argues that our decision established a new framework for analyzing private delegations which the Foundation could not have anticipated when it was spending money or by the Bank when it extended credit to the Foundation. Requiring the Foundation to refund assessments, they say, would impose undue financial hardship on the Foundation and the Bank and unjustly enrich the growers.

We decline to consider this issue on motion for rehearing. In response to our judgment in this case, the Legislature modified subchapter 74D of the Texas Agriculture Code, continuing the existence of the Foundation but strengthening the oversight role of the Commissioner of Agriculture in the eradication programs. *See* Act of May 30, 1997, 75th Leg., R.S., ch. 463. As part of these amendments, the Legislature dealt with the validation and ratification of assessments the growers approved under the statute's former version. *See id.* § 1.27. The new statute "validate[s], ratifie[s] and confirm[s]" assessments previously approved in the Southern Rolling Plains Zone, the Central Rolling Plains Zone, and the South Texas/Winter Garden Zone (zones not involved in these lawsuits). The statute ratifies the High Plains and Lower Rio Grande Valley assessments only for amounts actually collected prior to May 30, 1997, but not including assessments paid into the registry of the court or paid by a named plaintiff in one of these actions. *See id.* Thus, the appropriate forum for any challenge to the current law is in the trial court, not on motion for rehearing here.

\* \* \*

Appellant's motions for rehearing are overruled.

ENOCH, J., noted his dissent.